STATE OF NEBRASKA, APPELLEE, V. HARRY DEAN TATREAU, APPELLANT.

126 N. W. 2d 157

Filed February 7, 1964. No. 35554.

382

Nanfito & Nanfito, for appellant.

Clarence A. H. Meyer, Attorney General, and Homer G. Hamilton, for appellee.

Heard before WHITE, C. J., CARTER, MESSMORE, YEAGER, SPENCER, BOSLAUGH, and BROWER, JJ.

SPENCER, J.

This is an appeal from a conviction on an information charging Harry Dean Tatreau with imprisoning three children for the purpose of extorting money from their father. Harry Dean Tatreau will be hereinafter referred to as defendant. The State of Nebraska will be referred to as State.

We determine the following to be the facts necessary to understand the problem herein. On July 21, 1962, at approximately 7 a. m., shortly after Harry Lewis had left his home at 5619 Western Avenue, in the city of Omaha, Nebraska, his son Gary, who was asleep in a downstairs bedroom, was awakened by a man standing over him with a gun in his hand, and was told, " 'Do as we tell you and you won't be harmed.' " The man was wearing a dark suit with a white shirt, and his head was covered by a silk stocking mask. Another man with a gun, similarly clothed and masked, stood in the doorway. Gary's hands were bound with adhesive tape and he was taken upstairs to his mother's bedroom. She was awakened and taped in a similar fashion. She likewise was told to do as she was told and she wouldn't get hurt. She reached for her glasses but one of the men, later identified as the defendant, grabbed them and threw them, saying: " 'You won't be needing these, you don't have to see.' " The commotion brought her two

other children, Dennis and Marshall, who were sleeping in another upstairs room, to her room. The three boys were taped together with their hands interlocked, and were taken to the basement of the house by the defendant. They were placed in an enclosed basement room, identified as the washroom, and were told that if they had untaped themselves when the defendant came back to check the tape, they would be knocked down. The door was then closed and a sofa was moved against it so that the door could not be opened from the inside. The boys remained confined in the room until they were released by the police.

When the defendant took the boys to the basement, his companion, Junior James Salanitro, hereinafter referred to as Salanitro, took Mrs. Lewis downstairs to the livingroom. She knew that the boys had been taken to the basement, but did not know where, or what had happened to them. When the defendant returned, Mrs. Lewis complained that her hands were tied too tightly, and the defendant, in response to Salanitro's question, said: " 'It is not going to kill her.' " Mrs. Lewis was ordered to call her husband who was employed at Lewis Liquor Market, 818 North Sixteenth Street, Omaha, Nebraska. Because she could not see to dial the phone, she gave them the number. Salanitro dialed it and talked to her husband, then gave her the phone. The defendant went upstairs to an extension phone.

When his wife called, Harry Lewis, sensing something was wrong, started asking for information, and was told by one of the men on the phone: " 'Damn it, keep your mouth shut, we will tell you what we want done.' " Mrs. Lewis visited with her husband who had a heart condition. She told him not to get nervous, and that the men were holding them and wanted money from the store. Salanitro took the phone from Mrs. Lewis. Harry Lewis recognized two different male voices on the phone. He pleaded with them not to harm his family, and assured them he would be cooperative. He was told to go

to the front door, admit a man in a black coat, and give him the receipts from the store. He went to the front door and saw no one near the premises, so he went next door and told one Dave Bernstein to notify the police, and then went back to the telephone and reported that no one was at the front door or in front of the store. He was then told to check the back door, which he did. He reported back that no one was there, and was told to stay on the phone and keep talking. He could hear the two men visiting between themselves as to what should be done. All of a sudden over the phone he heard someone holler, " 'The police is here.' " Mrs. Lewis testified this had been precipitated by the ringing of the doorbell. The defendant dashed for the kitchen, and Salanitro dashed upstairs. Mrs. Lewis admitted the police. They found Salanitro under an upstairs bed, with his gun on his chest. The defendant escaped and was taken into custody at his attorney's office 3 days later.

Defendant urges six assignments of error, the first four of which essentially involve two issues: Was it necessary to remove the Lewis children from their place of abode to constitute imprisonment within the meaning of said section; and, if so, did the defendant imprison the Lewis children within the ambit of section 28-417, R. R. S. 1943?

The defendant was prosecuted under section 28-417, R. R. S. 1943, which is as follows: "Whoever shall kidnap or forcibly or fraudulently carry off or decoy out of this state any person or persons or shall arrest or imprison any person or persons, with the intention of having such person or persons carried out of the state, unless it be in pursuance of the laws thereof, shall be confined in the penitentiary not less than three nor more than seven years. *Whoever shall unlawfully carry off or decoy, entice away, secrete or imprison any person, for the purpose of extorting from such person or from his or her relatives or friends any money, property or promise, or for the purpose of compelling the perform-*

*ance of any act by such person or by any other person, association or corporation, shall upon conviction be imprisoned in the penitentiary for the term of the natural life of such person so offending.* Whoever, having for any of the purposes aforesaid unlawfully carried off or enticed away, decoyed, secreted or imprisoned any person, shall in furtherance of any such purpose, do or threaten to do any injury to the person so carried off, decoyed, enticed away, secreted or imprisoned, such person so offending shall upon conviction suffer death or be imprisoned in the penitentiary during the remainder of his natural life at the discretion of the jury. Whoever shall threaten to carry off, entice away, secrete or imprison any person for the purpose of extorting money from such person, or from his or her relatives or friends, shall upon conviction be imprisoned in the penitentiary not less than one nor more than twenty years." (Italics supplied.)

The aforesaid statute has four separate classifications. The first one is a restatement of the common law definition of kidnapping. The other three relate to offenses which constitute the crime, without the requirement for removal out of the state. The only difference in the last three is that no injury or threat need be present in the second classification. The one involved herein is the second classification, the one italicized. In this state, all public offenses are statutory; no act is criminal unless the Legislature has in express terms declared it to be so; and no person can be punished for any act or omission which is not made penal by the plain import of the written law. Lane v. State, 120 Neb. 302, 232 N. W. 96.

Do the facts herein bring this case within the ambit of the statute? Did the defendant imprison the Lewis children for the purpose of extorting money from their father?

Defendant argues that the State has failed to prove any imprisonment within the meaning of the statute, as intended by the Legislature when the present law was

enacted, because the three boys were not confined off the premises.

There is no question the present law was enacted after the Edward Cudahy kidnapping on December 18, 1900, because the law then in effect did not cover kidnapping if the victim was over 10 years of age unless the victim was to be transported out of the state. Chapter IV, section 18, of the Criminal Code, Compiled Statutes of Nebraska, 1889, was as follows: "Any person or persons who shall kidnap or forcibly or fraudulently carry off or decoy out of this state any person or persons, or shall arrest or imprison any person or persons, with the intention of having such person or persons carried out of the state, unless it be in pursuance of the laws thereof, shall be confined in the penitentiary not less than three nor more than seven years, and shall, moreover, be liable for the costs of prosecution." Section 20 of the same chapter was as follows: "Every person who shall maliciously or forcibly or fraudulently lead, take, or carry away, or decoy, or entice away, any child under the age of ten years, with intent unlawfully to detain or conceal such child from its parent or parents, or guardian, or other person having the lawful charge of such child, shall be imprisoned in the penitentiary not more than seven years nor less than one year."

Governor Dietrich, in his inaugural message of January 3, 1901, less than 3 weeks after the Cudahy kidnapping, directed the attention of the Legislature to this situation as indicated by the following paragraph: "Your attention is hereby directed to the inadequacy of the law applying to the crimes of kidnaping and child-stealing. I would recommend that the law be so amended as to make kidnaping or child-stealing a felony, punishable by imprisonment in the penitentiary for a period of not less than five years or more than thirty years, that the age limit be removed, and that the unlawful or forcible holding in capitivity of any

person at a place other than the natural or lawful domicile or abode of said person shall constitute the crime of kidnaping."

It is elementary that penal statutes are inelastic and must be strictly construed. They are never extended by implication. Weber v. State, 122 Neb. 369, 240 N. W. 429. From a reading of the act, however, it is apparent that the Legislature did not follow the Governor's recommendation. Rather, it broadened the scope of the legislation; made the penalties much more severe; and did not make it as restrictive as suggested by the Governor. The fact that this was done, and that none of the language suggested by the Governor with reference to restricting the crime to a situation where a person was held at a place other than his natural domicile or abode was used, would logically suggest that the Legislature did not so intend to restrict the act, which would negative the construction for which the defendant contends.

The controlling language of the statute in this case is: "* * * imprison * * * for the purpose of extorting * * * from his * * * relatives * * * any money * * *." We do not believe we should read into the act the requirement that the imprisonment must be at some place other than a domicile or abode of the party. Supposing a person were concealed in a little-used attic or in some recessed area not readily accessible on the premises. This might be a better place for concealment than any other spot in the neighborhood.

Did the confinement of the Lewis children constitute imprisonment? The trial court defined "imprison" as follows: " 'Imprison,' as used in these instructions, means to confine another person against his will within boundaries fixed by the actor for any time no matter how short in duration. The confinement is complete although there is a reasonable means of escape unless the person confined knows thereof. If he is conscious of confinement, imprisonment exists even though he does

not know by whom or how the confinement is imposed. It is not necessary that actual physical force or violence should be employed. It is essential that the conduct of the actor amount to a coercion of the will of the other person." This definition appears to be based at least in part upon the rules enumerated in Restatement, Torts, §§ 35 and 36, pp. 66 and 69. While the definition is broader than was necessary under the facts in this case, it was in no sense prejudicial to the rights of the defendant. "Imprison" as used in section 28-417, R. R. S. 1943, means the unlawful confinement of another person against his will within boundaries fixed by the actor for the purpose of extorting money, property, or a promise of the performance of an act.

The language used by the trial court does find support in the following from Dillon v. Sears-Roebuck Co., 125 Neb. 269, 249 N. W. 604, which was a civil action for false imprisonment: "The test is that there not only must be restraint, but such restraint must be exercised by compelling the restrained party to occupy a place within the limits fixed by the restraining party. In order for a restraint to amount to imprisonment, such restraint must be unlawful. There must be some actual interference with one's freedom of physical action or locomotion. This may be accomplished either by physical contact in which the restrained party's bodily strength is overpowered, or from language or gestures from which the restrained party might have a reasonable apprehension that any attempt to depart from the obnoxious surroundings would result in some aggression against his physical powers of mobility. All restraint is not unlawful, and the rule seems to be that only a wrongful restraint can be the basis of an action for false imprisonment.

" 'The true test seems to be, not the extent of the restraint (where the interference amounts to a restraint), but the lawfulness thereof.' 11 R. C. L. 793, sec. 5."

Black's Law Dictionary (4th Ed.), p. 889, defines the

term "imprisonment" as follows: "* * * the restraint of a man's personal liberty; coercion exercised upon a person to prevent the free exercise of his powers of locomotion. State v Shaw, 73 Vt. 149, 50 A. 863."

We find the following definition in Norton v. Mathers, 222 Iowa 1170, 271 N. W. 321: " '3 Blackstone's Commentaries (2d Ed.) 127, says: "Every confinement of the person is an imprisonment, whether it be in a common prison, or in a private house, or in the stocks, or even by forceably detaining one in the public streets." ' "

Defendant suggests that the case of Macomber v. State, 137 Neb. 882, 291 N. W. 674, is authority for his view. With this we cannot agree. It is true we there held that considering the history of the enactment of section 28-417, R. R. S. 1943, we did not believe the Legislature intended to include the state of facts which existed in that case within the statute. This finding, however, is controlled by the specific facts of that case. As we said: "Again referring to the statute, it indicates clearly that the person perpetrating the act has the commission of a crime or an unlawful act in mind at the time." Can there be any doubt but that the defendant in the instant case had the specific act committed in mind at all times?

As we said in Macomber v. State, *supra:* "The dominating element of the offense of kidnapping is the intent with which the acts enumerated in the statute are done." We also said: "When a statute is required to be construed strictly, such statute should have a sensible construction. The general terms contained therein should be so limited in their construction as not to lead to injustice, oppression or an absurd consequence." We further said: " 'Again, another guide to the meaning of a statute is found in the evil which it is designed to remedy; * * *.' "

The purpose of kidnapping in every instance is to make it possible to extort money or property or compel the performance of some act. In its nature it embraces other crimes as well as that of kidnapping, the one de-

fined. Its penalties, however, are much more severe than the other crimes which may be included in its provisions because of the consequences which may result from its perpetration. The dominating element of the offense is the intent with which the acts enumerated in the statute are committed.

In Macomber v. State, *supra*, we stated that the purpose of the statute was to secure the personal liberty of citizens, to protect the custody of parents or guardians or other persons having lawful custody of children, and finally to protect the children themselves.

It is readily obvious that the Legislature intended to include the imprisoning of any person for the purpose of extorting money from the person himself or his relatives or friends within the statute. As suggested earlier, we do not believe there was any intention on the part of the Legislature to exclude the possibility of imprisonment within one's own abode. This seems evident from the fact that a more restrictive provision was suggested by the Governor and was ignored by the Legislature. In this case, the Lewis children were taken and confined out of the sight of their mother to force her to call her husband and to insure his compliance with the demands made upon him. Clearly, this is the exact evil the statute was passed to prevent. To construe these facts as outside the intent of the statute would be to ignore the obvious.

Defendant's fifth assignment of error is the overruling of an objection to the testimony of a FBI expert on hair and fiber. The objection is not to the qualification of the expert, but is based on defendant's contention that the chain or custody of evidence was not established and that there was no sufficient foundation that the evidence had not been tampered with.

Before considering this point, we note that the evidence otherwise that the defendant was at the scene of the crime is very convincing. The identification of the defendant is not dependent upon the similarity of de-

fendant's hair with that found in the clothes abandoned near the scene. Defendant's car was found parked in the Lewis driveway. While none of the Lewis family saw his face because of the mask, they were able to identify him from other characteristics, such as the coloring of his hands, his build, walk, and a slight slouch. He was identified by a neighbor who saw him unmasked when he crossed some adjoining yards escaping from the scene. He was also observed in the company of Salanitro about 6 a. m. that morning at 3431 Hawthorne Street in Omaha, Nebraska, and at that time he was wearing a dark suit.

Subsequent to the escape, a police officer found a dark suit coat and pants in a yard approximately a block from 5619 Western Avenue. These exactly fit the defendant. A comb and some human hair were found in one of the pockets. These were placed in two separate white unsealed envelopes, and some hair clipped from the defendant's head was placed in another white unsealed envelope. These envelopes were folded, were sealed in a larger brown envelope, and placed in the evidence vault at the police station. Another officer took the coat and pants and the large envelope from the police vault and put them in a box for mailing to the FBI laboratory in Washington, D. C. His testimony was that he thought the individual white envelopes were sealed as well as folded. The box was opened in Washington by the expert who testified at the trial. It was his testimony the white envelopes when received were folded but unsealed. He made tests on the hair samples and concluded the samples submitted matched hair known to be that of the defendant. Defendant objected to this testimony because the envelopes were unsealed and the State had not negatived or eliminated the possibility that someone might have tampered with the hair samples after they had been placed in the evidence vault at the police department. There is no merit to defendant's contention.

The samples were put in separate envelopes and were folded and sealed in a large brown envelope which was kept in the vault until the evidence was sent to the FBI laboratory. The evidence was sufficiently identified, and the chain of possession sufficiently described so that a proper foundation was laid for its admission. Defendant's argument goes to its credibility, not to its admissibility.

Defendant's sixth assignment of error is as follows: "That the evidence in this case does not warrant the imposition of a Life Sentence, but does warrant a lesser sentence." Unfortunately for the defendant, this is not a case where the trial court is given any discretion in the length of the sentence. The penalty imposed on the defendant is the only one provided by the Legislature in the portion of section 28-417, R. R. S. 1943, under which defendant was prosecuted and convicted. It is the duty of a court to administer the law as it exists. See Simmons v. State, 111 Neb. 644, 197 N. W. 398.

Kidnapping is a crime which involves great moral turpitude. The potential of harm to the victim as well as to the relatives is so great that the severest of penalties is warranted. The range of the penalty for any offense is a matter for legislative determination. The court exercises its discretion as to the penalty to be applied under any particular state of facts within the range provided by the law. What we said in Sundahl v. State, 154 Neb. 550, 48 N. W. 2d 689, is controlling herein: "The Legislature has fixed the public policy of this state and determined what shall be done in cases of this character. It is a policy of long standing. It is a trite statement, but it is our duty to enforce the law."

In any event, even if permitted, we find nothing in this record which could be urged in extenuation of the acts of the defendant and Salanitro. The actions of defendant showed no consideration for the sensibilities or welfare of his victims. The record discloses that the husband and father, Harry Lewis, had a heart condi-

tion. It is extremely fortunate that this experience did not precipitate a heart attack and result in a fatality.

As defendant's sixth assignment of error would suggest, his contention is not that he did not commit the acts complained of, but that the acts did not constitute kidnapping within the intent of the statute. It is clear to us that the defendant had the intent to imprison the Lewis children for the purpose of extorting money from their father, and that this constitutes kidnapping within the meaning of section 28-417, R. R. S. 1943.

The evidence herein sustains the verdict, and the judgment should be and hereby is affirmed.

AFFIRMED.