187 N.W.2d 305 (1971)
187 Neb. 35
STATE of Nebraska, Appellee,
v.
Wayne GOHAM, Appellant.
No. 37744.
Supreme Court of Nebraska.
May 28, 1971.
*306 William G. Line, Kerrigan, Line & Martin, Fremont, Costello, Porter, Hill, Banks & Nelson, Rapid City, S. D., for appellant.
Clarence A. H. Meyer, Atty. Gen., Ralph H. Gillan, Asst. Atty. Gen., Lincoln, for appellee.
Heard before SPENCER, BOSLAUGH, SMITH, McCOWN, NEWTON and CLINTON, JJ.
SPENCER, Justice.
Defendant Wayne Goham was convicted on an information charging kidnapping and rape, and sentenced to life imprisonment on the former and to a term of not less than 3 nor more than 20 years on the latter. We affirm the convictions but modify the sentence as set out hereafter.
An automobile in which the complaining witness and her companion were riding slid off the road when they tried to negotiate a slippery, rain-soaked county road in Thurston *307 County. Another car, containing seven Indian occupants, came by and the occupants, for two dollars, helped them to get their car moving. The car was backed down the hill, but after a short descent its progress was stopped by the other car which had passed it and blocked the road. The occupants of that car then approached, opened the door on the driver's side, and pulled the companion of the complaining witness from the car, striking him two or three times. He fled to seek help at an adjoining farm house. Two of the occupants of the other car then forcibly pulled the complaining witness out of her car, dragged her to their own, and drove approximately 2 miles to Big Elk Park, which lies along the Missouri River on the eastern border of and in Thurston County, where she was taken out of that car and raped by each of the seven occupants.
William Cayou, who was one of the seven, testified for the State, identified the defendant as the driver and owner of the car, and as the second of the group to be with the complaining witness in the park. The defendant is a member of the Omaha Indian Tribe. The crimes were committed within the limits of the Omaha Indian Reservation, which is situated within Thurston County. The incident occurred on July 26, 1969. Defendant was tried and convicted in March 1970. On October 24, 1970, while an appeal from the conviction was pending in this court, the Secretary of the Interior published a notice in the Federal Register purporting to accept retrocession of jurisdiction over the Omaha Indian Reservation in Thurston County, Nebraska, purportedly pursuant to an offer of retrocession previously made by the Nebraska Legislature in accordance with 25 U.S.C.A., section 1323.
Defendant sets out seven assignments of error. The first is the denial of defendant's motion for a change of venue. He contends that "An avalanche of anti-Indian publicity" in Thurston County where the crime took place made it impossible to select a fair jury. The record does not support his contention. Defendant concedes his motion for a change of venue was technically defective in that it sought a change of venue to the district court for Douglas County rather than to an adjoining county, and that it was not supported by affidavits. The voir dire examination of the jurors, which is a part of the record, indicates that 79 prospective jurors were called. While a substantial number of them had heard about the case through the various news media, which is not unusual in a case of this nature, the record does not reflect prejudice existing at the time of the trial, which was 8 months later, to sustain defendant's contention. Defendant was able to secure an impartial jury and passed it for cause. Further, no specific complaint of any nature is made herein as to any bias or improper conduct on the part of the jury or any individual juror.
In State v. Losieau, 174 Neb. 320, 117 N.W.2d 775, we said: "A motion for a change of venue in a criminal case is addressed to the sound discretion of the trial court, and its ruling thereon will not be disturbed unless an abuse of such discretion is disclosed."
In Dosek v. United States, 405 F.2d 405, the Court of Appeals for the Eighth Circuit said: "The disposition by a judge of a change of venue motion rests largely in the discretion of the trial court who is the one most familiar with the local situation, and a trial court ruling upon such a motion will be upset only for a clear abuse of discretion." In that case the Court of Appeals emphasized that defendant had not charged or proved that any juror challenged for cause on valid grounds was not excused.
Defendant's second and third assignments of error involve the penalty inflicted on the kidnapping charge. After the crime was committed but before trial, the Nebraska Legislature amended section 28-417, R.R.S.1943, to provide that the penalty should be death or imprisonment for not less than 3 nor more than 50 years at the discretion of the jury. The penalty in effect when the crime was committed *308 provided the death penalty or life imprisonment at the discretion of the jury. The penalty inflicted was in accordance with the statute as it existed at the time the offense was committed. In view of our subsequent holding in State v. Randolph, 186 Neb. 297, 183 N.W.2d 225, the State concedes that the amendment to section 28-417, R.R.S.1943, which became effective September 19, 1969, should govern the penalty in this case.
In State v. Randolph, supra, we said: "There was no specific provision in the amending statute indicating legislative intent as to its prospective or retroactive operation. Section 49-301, R.R.S.1943, provides that repeal of a statute shall not in any manner affect pending actions nor causes of action accrued prior to any such repeal except as may be provided in the repealing statute. This `saving clause' on repeal applies to both civil and criminal statutes.
"While there is still some divergence of opinion among the states, we believe the better rule to be and we therefore hold that where a criminal statute is amended by mitigating the punishment, after the commission of a prohibited act but before final judgment, the punishment is that provided by the amendatory act unless the Legislature has specifically provided otherwise.
"The basic issue is, of course, the intention of the Legislature. As the Supreme Court of California said in In re Estrada, 63 Cal.2d 740, 48 Cal.Rptr. 172, 408 P.2d 948 (1965): `It is an inevitable inference that the Legislature must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply. The amendatory act imposing the lighter punishment can be applied constitutionally to acts committed before its passage provided the judgment convicting the defendant of the act is not final. This intent seems obvious, because to hold otherwise would be to conclude that the Legislature was motivated by a desire for vengeance, a conclusion not permitted in view of modern theories of penology.'"
State v. Randolph, supra, which involved the kidnapping statute, section 28-417, R.R.S.1943, was not released until January 22, 1971. This was several months after defendant's trial in March 1970.
Section 29-2308, R.R.S.1943, provides: "In all criminal cases that now are, or may hereafter be pending in the Supreme Court on error, the court may reduce the sentence rendered by the district court against the accused, when in its opinion the sentence is excessive, and it shall be the duty of the Supreme Court to render such sentence against the accused as in its opinion may be warranted by the evidence. No judgment shall be set aside, or new trial granted, or judgment rendered in any criminal case, on the grounds of misdirection of the jury, or the improper admission or rejection of evidence, or for error as to any matter of pleading or procedure, if the Supreme Court, after an examination of the entire cause, shall consider that no substantial miscarriage of justice has actually occurred."
We said in Cryderman v. State, 101 Neb. 85, 161 N.W. 1045, that this statute should be liberally construed in favor of justice. In State v. Hall, 176 Neb. 295, 125 N.W.2d 918, we construed it to grant authority to permit the reduction of a jury-imposed death penalty to life imprisonment when the circumstances indicated to us that life imprisonment was an adequate punishment for the offense.
We have no doubt of defendant's guilt herein. The misdirection of the jury as to possible penalties could not be considered a miscarriage of justice because it results from a subsequent construction of the statute involved. A verdict of life imprisonment was a permissible penalty for kidnapping when the offense was committed. This is no longer a penalty under our subsequent holding in State v. Randolph, supra. The maximum penalty under the amended statute which became effective September 19, 1969, 6 months before the actual trial herein, is death or imprisonment *309 for not less than 3 nor more than 50 years. We hold the amendatory act may be applied constitutionally to the act herein although committed prior to its passage, because the sentence had not become final because of this appeal.
Pursuant to section 29-2308, R.R.S.1943, considering all the circumstances and our subsequent holding in State v. Randolph, 186 Neb. 297, 183 N.W.2d 225, we reduce the penalty on Count I, the kidnapping conviction, from life imprisonment to a term of 35 years.
Defendant's fourth assignment of error is directed to the submission of the kidnapping charge. He relies on People v. Daniels, 71 Cal.2d 1119, 80 Cal.Rptr. 897, 459 P.2d 225, and People v. Levy, 15 N.Y.2d 159, 256 N.Y.S.2d 793, 204 N.E.2d 842, and argues that the modern trend is away from the use of kidnapping charges for behavior that amounts in substance to robbery or rape. We see no reason to change the controlling rules in this jurisdiction. The victim herein was forcibly taken from the automobile in which she was a passenger and transported at least 2 miles to Big Elk Park where she was forcibly raped. The kidnapping statute, section 28-417, R.R.S.1943, as it existed when the act was committed, so far as pertinent herein, provides: "Whoever, having for any of the purposes aforesaid unlawfully carried off or enticed away, decoyed, secreted or imprisoned any person, shall in furtherance of any such purpose, do or threaten to do any injury to the person so carried off, decoyed, enticed away, secreted or imprisoned, such person so offending shall upon conviction suffer death or be imprisoned in the Nebraska Penal and Correctional Complex during the remainder of his natural life at the discretion of the jury." We last interpreted this issue in State v. Tatreau, 176 Neb. 381, 126 N.W.2d 157, and State v. Salanitro, 176 Neb. 393, 126 N.W.2d 164, which provide a conclusive answer to defendant's contentions.
Defendant, in his fifth assignment of error, argues that the evidence was insufficient to sustain a conviction of kidnapping. The following testimony of the victim on direct examination illustrates the nature of the force used to effect the kidnapping: "Then they started to pull me out of the car, and I tried to hang on to the steering wheel and force myself against the frame of the car so they couldn't pull me out, and I said just leave us alone, and there was an individual on each side of me, and they pulled me over to their car, and I was kicking and trying to fight with them but they were just too heavy or too big and I couldn't get away from them, and when we got down to their car they tried to push me in the car, and I was very stiff, and they knocked my head against the open door so I was kind of dizzy for a few minutes, and then someone sort of like hit me in the stomach so that I would bend over, and that is when they put me in the front seat of the car, and then I remember kicking someone in the stomach who was pushing me in the car, and then they got in the car and one individual had his hand over my mouth and nose so that I couldn't breathe and I was a little panicky, and when he let me go I said I couldn't breathe and I wanted the window down, so I was sitting on the lap of the person who was by the door and I had my head out of the window all the time to the park. That is where they drove to."
The complaining witness was forcibly removed from her automobile, manhandled, and forcibly taken to a park approximately 2 miles away. We do not agree that this is an insubstantial movement of the victim, as suggested by the defendant. While it may be true that the ultimate objective was the crime of rape, this is of no moment. The purpose of kidnapping in every instance is to make it possible to commit some other crime. Its very nature therefore embraces other crimes as well as that of kidnapping. The penalties of kidnapping are intentionally more severe than the other crimes which may be included because of the consequences which often result from its perpetration. See State v. Tatreau, 176 Neb. 381, 126 N.W.2d 157.
*310 Defendant's sixth assignment of error is grounded on his contention that an accomplice, William Cayou, falsely testified that no consideration had been promised him for his testimony. This issue was injected by the defendant on his motion for a new trial on the grounds of newly discovered evidence. This evidence concerned some notes written by Cayou to a Charlene Earth while both of them were confined in the county jail. In this respect, we observe that the defendant had been told by Charlene Earth of her conversation with Cayou before his trial, and while defendant may not have had possession of the notes at the time of his trial, he was in possession of the information that Cayou was claiming he had made some type of a deal and was going to testify for the State.
There is no contention and certainly no evidence that the prosecution knowingly used perjured testimony. Even if we were to read into the inferences defendant wishes to make the finding that Cayou committed perjury, which we are unable to do, we still would have no evidence of the knowing use of perjured testimony by the prosecution. More important, however, we believe the evidence falls far short of showing that any deal was made with Cayou by the prosecution for his testimony. Giving the evidence adduced on the motion every possible inference, it does not go to the question of the truth or falsity of Cayou's testimony, but rather only to the question of Cayou's motive in testifying. It was purely a collateral issue, not having to do with the guilt or innocence of defendant. Its only purpose would be to impeach or discredit the witness.
This court has frequently said that impeaching evidence is not a proper basis for a new trial. See Rains v. State, 173 Neb. 586, 114 N.W.2d 399, and Fugate v. State, 169 Neb. 434, 99 N.W.2d 874, in which we said: "It is the rule that a new trial will not be granted on the ground of newly discovered evidence when the only effect of the evidence is to impeach or discredit a witness."
Defendant's last assignment of error alleges that he was denied the effective assistance of counsel because of counsel's consumption of intoxicants. Defendant's counsel was not court appointed but was retained counsel of defendant's own choice. There is no doubt that during the course of the trial, particularly after lunch, defendant's counsel had the odor of liquor on his breath. It is also undisputed that counsel had represented defendant and his family on other occasions and they knew that he used alcoholic liquors during the day. There is nothing apparent from the record which would indicate counsel became so incapacitated that he could not adequately conduct defendant's defense. The evidence falls far short of any indication that counsel's propensity prevented a fair trial. The most it indicates is that counsel consumed liquor on occasions when he was not in court. In any event, this court is not in as good a position as the trial court to decide the issue. The trial court had the opportunity to observe counsel, and was in a position to know whether counsel's drinking affected his ability to adequately represent the defendant. It is a fact question on which we accept the finding of the trial court. However, we are convinced that if defendant's counsel had come to court so far under the influence of alcoholic liquor that he could not effectively represent the defendant, the trial court would have immediately postponed the trial and held counsel in contempt of court.
As the Eighth Circuit Court of Appeals observed in Hanger v. United States, 428 F.2d 746: "`* * * a charge of inadequate representation can prevail "only if it can be said that what was or was not done by the defendant's attorney for his client made the proceedings a farce and a mockery of justice, shocking to the conscience of the Court."'" Defendant's showing falls far short of even suggesting this possibility.
Defendant injects the argument that the State of Nebraska has lost jurisdiction over the defendant by reason of retrocession. In 1953 Congress adopted 18 *311 U.S.C.A., section 1162, which, so far as pertinent for discussion of the question raised, provides: "(a) Each of the States or Territories listed in the following table shall have jurisdiction over offenses committed by or against Indians in the areas of Indian country listed opposite the name of the State or Territory to the same extent that such State or Territory has jurisdiction over offenses committed elsewhere within the State or Territory, and the criminal laws of such State or Territory shall have the same force and effect within such Indian country as they have elsewhere within the State or Territory:

 "State or
 Territory of Indian country affected
"Alaska ........ All Indian country within the Territory
"California ...... All Indian country within the State
"Minnesota ..... All Indian country within the State,
 except the Red Lake Reservation
"Nebraska ...... All Indian country within the State
"Oregon ....... All Indian country within the State,
 except the Warm Springs Reservation
"Wisconsin ..... All Indian country within the State."

In 1968 Congress provided for the voluntary retrocession of the jurisdiction granted by 18 U.S.C.A., section 1162, by passing 25 U.S.C.A., section 1323, which provides: "(a) The United States is authorized to accept a retrocession by any State of all or any measure of the criminal or civil jurisdiction, or both, acquired by such State pursuant to the provisions of section 1162 of Title 18, section 1360 of Title 28, or section 7 of the Act of August 15, 1953 (67 Stat. 588), as it was in effect prior to its repeal by subsection (b) of this Section.
"(b) Section 7 of the Act of August 15, 1953 (67 Stat. 588), is hereby repealed, but such repeal shall not affect any cession of jurisdiction made pursuant to such section prior to its repeal. Pub.L. 90-284, Title IV, s. 403, Apr. 11, 1968, 82 Stat. 79."
On April 16, 1969, the Nebraska Legislature adopted Legislative Resolution 37, which, so far as pertinent herein, reads: "Now, Therefore, Be It Resolved By The Members Of The Nebraska Legislature In Eightieth Session Assembled:
"1. That the State of Nebraska hereby retrocedes to the United States all jurisdiction over offenses committed by or against Indians in the areas of Indian country located in Thurston County, Nebraska, acquired by the State of Nebraska pursuant to Public Law 280 of 1953, except as provided in paragraph 2 of this resolution.
"2. That the retrocession of jurisdiction contained in paragraph 1 of this resolution shall not apply to any offenses involving the operation of motor vehicles on public roads or highway.
"3. That the Executive Board of the Legislative Council is hereby authorized and directed to take all necessary action to put this resolution into effect, such action to include arrangements with the Department of the Interior and the department's Bureau of Indian Affairs concerning the assumption of law enforcement responsibilities in the areas of Indian country covered by this resolution."
By Executive Order dated November 21, 1968, the Secretary of the Interior was authorized to accept any retrocession of jurisdiction which was to be effected by publication in the Federal Register. On October 24, 1970, the Secretary caused the following notice to be published in the Federal Register: "Pursuant to the authority vested in the Secretary of Interior by Executive Order No. 11435 (33 F.R. 17339) I hereby accept, as of 12:01 A.M. EST, October 25, 1970, retrocession to the United States of all jurisdiction exercised by the State of Nebraska over offenses committed by or against Indians in the areas of Indian country located within the boundaries of the Omaha Indian Reservation in Thurston County, Nebr. as follows: (Description boundaries omitted) except offenses involving the operation of motor vehicles on public roads or highways which retrocession was tendered and offered by Legislative Resolution No. 37 passed by the Legislature of Nebraska in 80th Regular Session on the 16th day of April, 1969.
 "Walter J. Hickel
 "Secretary of the Interior."
*312 It is to be noted that the Nebraska Legislative Resolution was to retrocede all jurisdiction over offenses committed by or against Indians in the Indian country located in Thurston County acquired by the State pursuant to Public Law 280 of 1953, except traffic offenses. In the discussion on Legislative Resolution 37, the statement is made that the Commissioner of Indian Affairs had approved the Resolution and had agreed to accept retrocession of all Indian territory in Thurston County, which includes both the Omaha and Winnebago Tribes. The acceptance by the Secretary of the Interior, however, is only a partial acceptance of retrocession of jurisdiction. It is specifically limited to the areas of Indian country located within the boundaries of the Omaha Indian Reservation in Thurston County. This definitely was not an acceptance of the retrocession offered, which was all of the Indian territory in Thurston County, and in our judgment is completely unauthorized by the terms of the Resolution of the Nebraska Legislature, and so does not constitute an acceptance. The difficulties apparent in trying to exercise jurisdiction in only a part of the Indian territory in Thurston County, which includes both Winnebago and Omaha Indians, are so patent as not to need elaboration. The Nebraska Legislature recognized this problem, and manifested its unwillingness to accept the counter proposal.
On February 1, 1971, the Nebraska Legislature adopted Resolution 16, which provides: "Whereas, the Eightieth Session of the Nebraska State Legislature, 1969, adopted Legislative Resolution 37, relating to the retrocession to the United States of jurisdiction over offenses committed by or against Indians in the areas of Indian country located in Thurston County, Nebraska, acquired by the State of Nebraska pursuant to Public Law 280 of 1953; and
"Whereas, the United States has not accepted retrocession in accordance with the terms and provisions of said Legislative Resolution 37,
"Now, Therefore, Be It Resolved By The Members Of The Eighty-second Legislature of Nebraska, First Session:
"1. That the action of the Eightieth Session of the Nebraska State Legislature, 1969, approving Legislative Resolution 37 is rescinded, and the offer of retrocession therein contained is withdrawn.
"2. That a duly attested copy of the resolution be transmitted by the Clerk of the Legislature to the Secretary of Interior of the United States."
In our judgment, the original resolution of retrocession could not be effective until it was accepted by the federal government. A partial acceptance is not effective unless and until it is approved by the state. The determination of the extent of retrocession was left to the states by 25 U.S.C.A., section 1323, since the United States is authorized to accept all or any measure of retrocession. The measure of jurisdiction to be retroceded was a matter for the state to determine, and is not dictated in any way by the federal act. The attempted acceptance was not in accordance with the terms of the offer, and was therefore of no force and effect. The offer of retrocession having been withdrawn, 18 U.S.C.A., section 1162, is still applicable in Nebraska.
Having reached the conclusion that retrocession never became effective, it is unnecessary to discuss the questions raised by the parties to be considered in the event we had found retrocession to be effective.
For the reasons given above, the conviction of the defendant on both Counts I and II is affirmed. The penalty on Count I is reduced from life imprisonment to a term of 35 years. The judgment entered is affirmed in all particulars except as noted above.
Affirmed as modified.
McCOWN, Justice.
I concur in the affirmance of the convictions. I do not concur in the later disposition.