DANIEL J. VENCIL, APPELLANT, V. VALMONT INDUSTRIES, INC., APPELLEE.

473 N.W.2d 409

Filed August 30, 1991.   No. 90-1065.

Richard L. Swenson for appellant.

Eric W. Kruger and William L. Switzer, Jr., of Rickerson, Welch & Kruger, for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

PER CURIAM.

Plaintiff-appellant, Daniel J. Vencil, asserts, in summary, that the court below wrongly interpreted the applicable law and further erred in concluding that the evidence failed to establish he was entitled to workers' compensation benefits from his employer, defendant-appellee Valmont Industries, Inc. We affirm.

Vencil, having been born on March 9, 1961, is 30 years old. He graduated from high school on May 16, 1979, and began working for Valmont on August 27 of that year. He continued in this employment, his first and only full-time job, until July 31, 1989. Although he performed various duties, his work at all times required continuous bending, twisting, stooping, and the lifting and pushing of items weighing up to 200 pounds.

He began having low back pain in 1986 or 1987 which, over time, increased both in frequency and severity. He first consulted a physician in late 1988 or early 1989. By then, the pain was both intense and constant. On February 15, 1990,

after a course of conservative treatment, surgery was performed on his low back, and he began to experience some relief.

There is general agreement among the various examining and treating physicians, including the surgeon who performed the surgery, that although it cannot be said with reasonable medical certainty that Vencil's back condition was the direct result of his employment, his work activity contributed to and aggravated his condition. In the surgeon's view, although there was no specific instance of trauma or injury, the condition was consistent with the "kind of repetitive ongoing trauma that gradually caused deterioration of the fibers around the disk that then eventually allowed it to bulge out."

The disposition of Vencil's argument that his condition is compensable either as being the result of an accident or an occupational disease, or some hybrid of the two, is controlled by the recently decided *Maxson v. Michael Todd & Co.*, 238 Neb. 209, 469 N.W.2d 542 (1991). We therein held that the compensability of a condition resulting from the cumulative effects of repeated work-related trauma is to be tested under the definition of accident contained in Neb. Rev. Stat. § 48-151(2) (Reissue 1988). That statute requires, among other things, that there be an injury which happens "suddenly and violently . . . producing at the time objective symptoms of an injury." The cumulative effects of repeated work-related trauma which do not at an identifiable moment produce objective symptoms requiring, within a reasonably limited period of time, medical attention and the interruption or discontinuance of employment are not the product of an accidental injury within the purview of § 48-151(2). *Maxson, supra.*

Vencil developed his symptoms over a period of not less than 7 years, and they required no interruption or discontinuance of his employment until almost 10 years had elapsed. Thus, the record fails to sustain either of Vencil's summarized assignments of error.

AFFIRMED.

SHANAHAN, J., dissenting.

To understand Vencil's case, and attempt to comprehend the majority's decision, one must start with the Nebraska Workers'

Compensation Act and the fact that Vencil asserted alternative bases for compensability of his claim: an injury caused by a work-related accident or an occupational disease.

Neb. Rev. Stat. § 48-101 (Reissue 1988) of the act provides:

> When personal injury is caused to an employee by accident or occupational disease, arising out of and in the course of his or her employment, such employee shall receive compensation therefor from his or her employer if the employee was not willfully negligent at the time of receiving such injury.

Thus, by virtue of § 48-101, compensability of a worker's claim may be alternatively based on a work-related accident or an occupational disease. In view of the alternative bases for compensability, the Nebraska Workers' Compensation Act, in Neb. Rev. Stat. § 48-151(2) (Reissue 1988), supplies the definition of "accident," namely, accident shall "mean an unexpected or unforeseen injury happening suddenly and violently, with or without human fault, and producing at the time objective symptoms of an injury." Consistent with § 48-101 and alternative compensability, § 48-151(3) states: "The term occupational disease shall mean only a disease which is due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation, process, or employment and shall exclude all ordinary diseases of life to which the general public is exposed."

Since § 48-151(3) offers a definition which includes the very thing to be defined, that is, "occupational disease shall mean only a disease," this court, in *Maxson v. Michael Todd & Co.*, 238 Neb. 209, 212, 469 N.W.2d 542, 544 (1991), recognized the following definition for "disease": " '[A]n impairment of the normal state of the living animal . . . body or of any of its components that interrupts or modifies the performance of the vital functions, being a response to environmental factors [such as] industrial hazards . . . .' " The preceding definition substantially coincides with the standard medical definition of "disease," namely: "[A]ny deviation from or interruption of the normal structure or function of any part, organ, or system (or combination thereof) of the body that is manifested by a characteristic set of symptoms and signs and whose etiology,

pathology, and prognosis may be known or unknown." Dorland's Illustrated Medical Dictionary 385 (26th ed. 1981). Also, from a medical standpoint, an "occupational disease" is "due to factors involved in one's employment, e.g., various forms of pneumoconiosis or dermatitis." *Id.* at 392. "Trauma" means "a wound or injury, whether physical or psychic." *Id.* at 1388. Thus, an occupational disease is a condition which causes impairment, deviation, or interruption of the normal structure or function of a worker's body and which results from hazards or conditions peculiar to a particular occupation or employment.

Referring to "occupational disease" in § 48-151(3), this court noted in *Ritter v. Hawkeye-Security Ins. Co.*, 178 Neb. 792, 795, 135 N.W.2d 470, 472 (1965):

> The requirement of the statute is that the cause and conditions of the disease be characteristic of and peculiar to the employment and that the disease be other than an ordinary disease of life. The statute does not require that the disease be one which originates exclusively from the employment. The statute means that the conditions of the employment must result in a hazard which distinguishes it in character from employment generally.

As Professor Larson points out:

> [T]he two crucial points of distinction between accident and occupational disease were the element of unexpectedness and the matter of time-definiteness. What set occupational disease apart from accidental injuries was both the fact that they could not honestly be said to be unexpected, since they were recognized as inherent hazard of continued exposure to conditions of the particular employment, and the fact that they were gradual rather than sudden in onset.

1B A. Larson, The Law of Workmen's Compensation § 41.31 at 7-491 to 7-492 (1991).

In line with the foregoing characterization and observations regarding an occupational disease, this court has recognized compensability in the following occupational disease cases: *Osteen v. A. C. and S., Inc.*, 209 Neb. 282, 307 N.W.2d 514 (1981) (peritoneal mesothelioma, a rare form of abdominal

cancer caused by protracted exposure to asbestos particles); *Ritter v. Hawkeye-Security Ins. Co., supra* (a dishwasher's contact dermatitis caused by repeated exposure to solvents and cleaning agents); *Riggs v. Gooch Milling & Elevator Co.*, 173 Neb. 70, 112 N.W.2d 531 (1961) (millworker's inhaling wheat dust over an extended period resulted in emphysema, with secondary polycythemia, pneumoconiosis, and a decompensated heart); and *Hauff v. Kimball,* 163 Neb. 55, 77 N.W.2d 683 (1956) (granite cutter's contraction of pneumoconiosis silicosis, an inflammatory disease of the lungs due to silica dust inhaled during nearly 40 years' employment). In each of the foregoing cases, a worker sustained work-related bodily injury (trauma) and eventual disability or death from the accumulation of repeated trauma, although the injury was not dramatically and immediately discernible when any individualized trauma recurred to the body.

In Vencil's case the uncontradicted medical evidence definitely established the causal connection between Vencil's repeated lifting, bending, and twisting, which were present in an unusual degree in Vencil's employment at Valmont, and the back problem, which is the basis for Vencil's claim for compensation. Vencil, 28 years old when his disabling condition prevented his further working, had no back injury before his employment with Valmont. In light of Vencil's 10-year work history of repetitive activity which placed extraordinary stress on his back, the neurosurgeon who attended Vencil stated that "most degenerative lumbar disk problems that I see are caused by repetitive heavy lifting, bending, twisting at work and activities in the course of daily living. I expect that Mr. Vencil's job, which includes lots of bending and lifting, has contributed to his problem." According to the neurosurgeon, Vencil's "degenerative lumbar disk disease" was attributable to the "repetitive motion injury" which resulted from "frequent lifting" at Valmont. Another of Vencil's physicians, an orthopedic surgeon, testified that there was no specifically indicated trauma to Vencil, before or after Vencil commenced working for Valmont, but that the particular type of work had a "considerable effect" on Vencil, that is, "but for" the work activity at Valmont, Vencil would not have suffered the back

condition which is the basis for his compensation claim. The orthopedist likened Vencil's condition to carpal tunnel syndrome, "an appropriate comparison" in view of the repeated trauma and persistent stress on Vencil's back, and concluded that "if [Vencil] had not been involved in this heavy type of work, there's a good probability that he would not have developed the problems he did," since it was more probable than not that Vencil would not have developed the back condition in the absence of the work-related "repetitive ongoing trauma" to Vencil's back. In the orthopod's opinion, "[I]t's a lot less likely that [Vencil] would have developed [his back condition] in the foreseeable future if it hadn't been for his work."

At the rehearing in Vencil's case, the compensation court found that there was no accident to afford compensability inasmuch as Vencil failed to prove that his injury occurred at a definite time or resulted in objective symptoms at "an identifiable point." In sustaining the decision by the compensation court, the majority falls back on *Maxson v. Michael Todd & Co.*, 238 Neb. 209, 469 N.W.2d 542 (1991), for the proposition "[C]ompensability of a condition resulting from the cumulative effects of repeated work-related trauma is to be tested under the definition of accident contained in Neb. Rev. Stat. § 48-151(2) (Reissue 1988)." (Syllabus of the court.) True, in *Maxson*, to which Judges Shanahan and Grant dissented, this court stated:

> While it is thus quite clear that a condition resulting from the cumulative effects of repeated work-related trauma has some characteristics of both an accidental injury and an occupational disease, this court has concluded that the compensability of such a condition is to be tested under the statutory definition of accident. *Crosby v. American Stores*, 207 Neb. 251, 298 N.W.2d 157 (1980).

*Maxson, supra* at 212, 469 N.W.2d at 544.

However, as the reader will readily discern, the *Maxson* rule for compensability of cumulative effects from repeated work-related trauma is not a quotation, that is, a verbatim excerpt, from *Crosby v. American Stores*, 207 Neb. 251, 298 N.W.2d 157 (1980), which involved a claim for compensation

based on carpal tunnel syndrome caused by work-related tasks—assembling boxes and stacking boxes filled with meat. At the one-judge hearing in the compensation court, the judge held that Crosby's carpal tunnel syndrome was an occupational disease and, therefore, compensable. In a de novo determination on rehearing, the compensation court found that Crosby "had suffered an 'accident and injury,' as a result of' repeated trauma to her hands." 207 Neb. at 253, 298 N.W.2d at 159. American Stores appealed and contended that "the compensation court, on rehearing, erred in finding that [Crosby] suffered carpal tunnel syndrome as the result of an accident arising out of her employment" with American Stores. *Id.*

In *Crosby*, this court stated:

Part of the difficulty in this case is that the plaintiff's injury has some of the characteristics of both an accidental injury and an occupational disease.

The plaintiff's use of her hands to strike the pallets and boxes caused an injury which produced objective symptoms at the time. Each striking was a sudden and violent event. Although no one blow produced an injury severe enough to be compensable by itself, the cumulative effect of the repeated trauma resulted in an injury which produced disability. Most jurisdictions regard the time of accident as sufficiently definite if either the cause is reasonably limited in time or the result materializes at an identifiable point. 1B Larson, Workmen's Compensation Law § 39.00 (1980). The facts in this case satisfied both tests. The plaintiff's difficulty with her hands commenced immediately after she was transferred to stack and record. In that respect, this case may be distinguished from cases involving chronic conditions which develop over a period of many years where the injury cannot be traced to a particular job or activity of the workman.

The plaintiff's injury involved in this case resembles an occupational disease in that it developed over a period of time in a manner in which many diseases develop. There is some evidence that the temperature conditions which prevail in a packing plant contribute to the development

of the injury which is found among employees in packing plants. There is other evidence that the injury has many possible causes and may be considered to be an ordinary disease of life.

We think the analysis made by the compensation court, on rehearing, was correct on the facts in this case. The judgment is, therefore, affirmed.

*Crosby, supra* at 254-55, 298 N.W.2d at 159.

Apparently, the digressive discussion about occupational disease, a nonissue in *Crosby*, decoyed Larson to view *Crosby* as Nebraska's acknowledgment that carpal tunnel syndrome may be an occupational disease, as reflected in Larson's statement in reference to *Crosby*:

Claimant suffered from carpal tunnel syndrome, an occupational disease. The court held that claimant had suffered an accident and injury as a result of repeated trauma to her hands. An accident need not be a single traumatic event. The injury resembled an occupational disease in that it developed over a long period of time and was peculiar to claimant's type of occupation. Therefore, she was entitled to compensation under the theory of occupational disease.

1B A. Larson, *supra*, § 41.33(b) n.45 at 7-534.

Although the work-related carpal tunnel syndrome in *Crosby* was obviously compensable as an occupational disease, the *Crosby* court allowed compensability on the basis of an "accident" characterized in § 48-151(2). Therefore, since the *Crosby* court affirmed an award in which the only issue was whether the injury was caused by a work-related accident, *Crosby* can only be read as recognition that under the particular facts in *Crosby*, the compensation court correctly concluded that Crosby's injury resulted from an accident, and cannot realistically be read to preclude compensability based on the cumulative effect of repetitive work-related trauma characterized as an "occupational disease."

Therefore, the *Maxson* rule, that is, "[C]ompensability of a condition resulting from the cumulative effects of repeated work-related trauma is to be tested under the definition of accident contained in Neb. Rev. Stat. § 48-151(2) (Reissue

1988)," is an obvious misreading and unfortunately consequential misinterpretation of *Crosby* and is irreconcilable with the Nebraska Workers' Compensation Act. Consequently, while evidence may fail to substantiate Vencil's claim based on a work-related accident, the undisputed evidence establishes that Vencil's back problem is an occupational disease within the meaning of § 48-151(3).

Several courts, applying provisions of workers' compensation acts containing language similar to that in § 48-151(3), have determined that back conditions resulting from repetitive and cumulative work-related traumas such as exist in Vencil's case are occupational diseases. See, *Patterson v. Connor*, 19 Ohio App. 3d 304, 484 N.E.2d 240 (1984) (a nurse's herniated disk was an occupational disease, because the disease was peculiar to her employment); *Shelby Mut. Ins. Co. v. DILHR*, 109 Wis. 2d 655, 327 N.W.2d 178 (1982) (claimant's herniated disk and degenerative arthritis, resulting from a 24-year career of heavy lifting and shoveling, constituted an occupational disease); *Matter of Keefer v. Norton Co.*, 68 A.D.2d 961, 414 N.Y.S.2d 764 (1979) (a claimant who suffered a herniated disk as the result of repeatedly lifting belts which weighed between 20 and 90 pounds contracted an occupational disease); *Fruehauf Corp. v. Workmen's Comp. App. Bd.*, 68 Cal. 2d 569, 440 P.2d 236, 68 Cal. Rptr. 164 (1968) (an employee whose work involved heavy lifting, twisting, and bending which resulted in three protruded lumbar disks, suffered an occupational disease); *Matter of Ross v. Kollsman Instrument Corp.*, 24 A.D.2d 670, 261 N.Y.S.2d 186 (1965) (a claimant who worked the same job for 20 years, which required bending, lifting, and carrying various weights, suffered an occupational disease, not an accident). A multitude of other decisions recognizing compensability of an occupational disease resulting from repeated trauma are included in the extensive annotations in 1B A. Larson, The Law of Workmen's Compensation §§ 41.33(b) and 41.42 (1991).

In view of Vencil's age, it is somewhat disingenuous to portray Vencil as one in an aging labor force, worn down by years of work and about to be listed among those who "have shuffled off this mortal coil." More disappointing is the view

that rather than assessing payment from those responsible for work-related injury and loss, the judiciary should pass the bucks of cost to taxpayers for payment from public funds. While that may be an adroit political maneuver and, to some, even the politically correct course of action, the judiciary should not be such a passionate paramour of politics. The fact remains that the majority's constricted construction of the Nebraska Workers' Compensation Act concerning compensability of disability from repeated trauma will eventually squeeze "occupational disease" out of the act. Moreover, after judicial disuse and demolition of the definition of "occupational disease" in the Nebraska Workers' Compensation Act, saying that the Legislature now has the occasion to restructure the statutory definition of "occupational disease" is much like saying that the fire started by the O'Leary cow's kicking over the lantern presented Chicago with a wonderful opportunity for urban redevelopment.

Obviously, in Vencil's case, the issue is not compensability for protracted and gradual deterioration of the human body, occurring usually and naturally throughout a lifetime outside any occupation or employment. The basic question is whether Vencil's employment conditions at Valmont caused disability from an occupational disease. Vencil's plight, shared with a good many other workers, is an inability to point to an isolated or solitary traumatic event on a specific workday and, nonetheless, experiencing a gradual onset and eventually resulting disease generated by repeated trauma. Therefore, what this court again faces is the prevalent problem presented by a worker's body or limbs subjected to work-related trauma over many months and perhaps years counted in decades. However, if this court, viewing the Nebraska Workers' Compensation Act in a narrow range of vision, continues misconstruction of *Crosby* through adherence to the *Maxson* rule that compensability for cumulative effects of repetitive work-related trauma is determined solely by an "identifiable moment" within the definition of accident under § 48-151(2), and excludes repetitive work-related trauma as an occupational disease within § 48-151(3), then the accident test currently used

by this court is a symptom of occupational diseases in the judiciary: retinitis pigmentosa statutorum and decisional dyslexia. Presently, the only physician to cure those illnesses is the Legislature.

Nevertheless, this cause should have been remanded to the Workers' Compensation Court, since Vencil proved a prima facie case that he suffers an occupational disease caused by his employment at Valmont. Hence, the compensation court is clearly erroneous in its conclusion that Vencil failed to establish compensability for his claim.

GRANT, J., dissenting.

I respectfully dissent based on the reasons set out in my dissent in *Maxson v. Michael Todd & Co.*, 238 Neb. 209, 469 N.W.2d 542 (1991). I further state that it appears to me that the holding in *Sandel v. Packaging Co. of America*, 211 Neb. 149, 317 N.W.2d 910 (1982), has not only been diluted in this case, but has been overruled. The positions of the dissents in *Sandel, supra*, and in *Hayes v. A.M. Cohron, Inc.*, 224 Neb. 579, 400 N.W.2d 244 (1987), seem to have overruled *Sandel, supra*, sub silentio. I would reverse.

CAPORALE, J., concurring.

It seems to me that my dissenting colleagues' criticisms of the majority opinion inflate the judicial role. The plaintiff herein seeks workers' compensation benefits because he is gradually wearing out. However, the Nebraska Workers' Compensation Act compensates only those personal injuries which result from "accident or occupational disease, arising out of and in the course of . . . employment." Neb. Rev. Stat. § 48-101 (Reissue 1988). The gradual wearing process falls neither within this jurisdiction's definition of accident or occupational disease, see *Maxson v. Michael Todd & Co.*, 238 Neb. 209, 469 N.W.2d 542 (1991), nor, I submit, within any reasonable definition of those terms. Although some do so at a slower rate than others, we need no evidential record to tell us that all humans gradually wear out until the process produces death.

Admittedly, some occupations contribute to the wearing process more than do others. Thus, there may be a basis for compensating gradual work-caused wear under some system or

another. I suggest that the federal Social Security Act does precisely that. See 42 U.S.C. § 423 (1988). Nonetheless, there may be some who would argue that our compensation act should supplement any other existing system and be extended to cover gradual work-caused wear.

I submit, however, that such is a policy decision to be made by our Legislature after full study, debate, and understanding of the economics involved; it is not a burden to be forced upon the employers of this state by judicial fiat. See, Neb. Const. art. II, § 1 (divides powers of government into the legislative, executive, and judicial branches and, as a general matter, prohibits one branch from encroaching on duties and prerogatives of other branches); *State ex rel. Spire v. Conway*, 238 Neb. 766, 472 N.W.2d 403 (1991). See, also, *Nebraska P.P. Dist. v. City of York*, 212 Neb. 747, 326 N.W.2d 22 (1982) (function of Legislature to declare law by enactment of statutes); *Bowers v. Maire*, 179 Neb. 239, 137 N.W.2d 796 (1965) (court will not indulge in judicial legislation); *State v. Tatreau*, 176 Neb. 381, 126 N.W.2d 157 (1964) (duty of court to administer law as it exists).

BOSLAUGH, WHITE, and FAHRNBRUCH, JJ., join in this concurrence.