**OMAHA TRIBE OF NEBRASKA et al.,**
**Plaintiffs,**

v.

**VILLAGE OF WALTHILL et al.,**
**Defendants.**

**Civ. 71-0-114.**

United States District Court,
D. Nebraska.

Nov. 23, 1971.

William K. Schaphorst, Asst. U. S. Atty., D. Nebraska, for plaintiffs.

Robert G. Scoville, South Sioux City, Neb., Ronald K. Samuelson, Walthill, Neb., and Mel Kammerlohr, Asst. Atty. Gen., for defendants.

## MEMORANDUM

RICHARD E. ROBINSON, Chief Judge.

This matter comes before me upon the motion of plaintiffs and the cross-motion of defendants for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Said motions having been made verbally at the end of a hearing regarding plaintiffs' motion for a temporary injunction. [Filing #2].

Jurisdiction is vested by virtue of 28 U.S.C. § 1362.

All of the counsel appearing in this matter have been of considerable assistance to me in presenting the legal issues involved.

The plaintiffs in this action are the Omaha Tribe of Nebraska, the Tribal Council, and the Membership of the Tribe. The defendants are the Village of Walthill, Thurston County, The State of Nebraska, and certain named county and state officials.

In 1953 the United States Congress, by virtue of 67 Stat. 588,[1] provided that

---

1. This enactment is now embodied in 28 U.S.C. § 1360 and 18 U.S.C. § 1162. Section 1360 provides in pertinent part as follows:

"[a] Each of the States or Territories listed in the following table shall have jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian country listed opposite the name of the State or Territory to the same extent that such State or Territory has jurisdiction over other civil causes of action, and those civil laws of such State or Territory that are of general application to private persons or private property shall have the same force and effect within such Indian country as they have elsewhere within the State or Territory:

| State or Territory | Indian country affected |
|---|---|
| * * | * * * |
| Nebraska * * | * All Indian country within the State. |
| * * | * * * |

"[b] Nothing in this section shall authorize the alienation, encumbrance, or taxation of any real or personal property, including water rights, belonging to any Indian or any Indian tribe, band, or community that is held in trust by the United States or is sub- ject to a restriction against alienation imposed by the United States; or shall authorize regulation of the use of such property in a manner inconsistent with any Federal Treaty, agreement, or statute or with any regulation made pursuant thereto; or shall confer jurisdiction upon the State to adjudicate, in probate proceedings or otherwise, the ownership or right to possesion of such property or any interest therein.

"[c] Any tribal ordinance or custom heretofore or hereafter adopted by an Indian tribe, band, or community in the exercise of any authority which it may possess shall, if not inconsistent with any applicable civil law of the State, be given full force and effect in the determination of civil causes of action pursuant to this section."

Section 1162 provides in pertinent part:

"[a] Each of the States or Territories listed in the following table shall have jurisdiction over offenses committed by or against Indians in the areas of Indian country listed opposite the name of the State or Territory to the same extent that such State or Territory has jurisdiction over offenses committed elsewhere within the State or Territory, and the criminal laws of such State or Territory shall have the same force and effect within such Indian country

Nebraska should have both civil and criminal jurisdiction over all the Indian country,[2] within the State of Nebraska, to the same extent as the State exercised jurisdiction in the rest of the State. The Act did not call for any formal acceptance by the State but apparently conferred jurisdiction automatically.[3] In any event, Nebraska did in fact commence exercising jurisdiction pursuant to the federal act, and it is thus clear that the State representatives did not deem it necessary to formally accept.

In 1968 Congress authorized the United States to accept retrocession by any state " * * * of all or any measure of the criminal or civil jurisdiction. * * * " granted by 67 Stat. 588.[4] The United States Secretary of Interior was designated by the President to accept such retrocession on behalf of the United States.[5]

as they have elsewhere within the State or Territory:

| State or Territory | Indian country affected. |
|---|---|
| * * | * * * |
| Nebraska | All indian country within the State. |

"[b] Nothing in this section shall authorize the alienation, encumbrance, or taxation of any real or personal property, including water rights, belonging to any Indian or any Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States; or shall authorize regulation of the use of such property in a manner inconsistent with any Federal Treaty, agreement, or statute or with any regulation made pursuant thereto; or shall deprive any Indian or any Indian tribe, band, or community of any right, privilege, or immunity afforded under Federal treaty, agreement, or statute with respect to hunting, trapping, or fishing or the control, licensing, or regulation thereof.

"[c] The provisions of sections 1152 and 1153 of this chapter shall not be applicable within the areas of Indian country listed in subsection [a] of this section."

2. The definition of "Indian Country" is found at 18 U.S.C. § 1151.

3. In Anderson v. Gladden, 293 F.2d 463 [9th Cir. 1961], cert. denied, 368 U.S. 949, 82 S.Ct. 390, 7 L.Ed.2d 344 [1961], an Indian who had been tried by the state of Oregon for homicide, contended in a habeas corpus proceeding in federal court, that the State of Oregon, which had been included in 18 U.S.C. § 1162 along with the State of Nebraska, did not have jurisdiction to try him, without first enacting affirmative legislation accepting the jurisdiction which 18 U.S.C. § 1162 purported to bestow.

The Ninth Circuit said "[w]hether the courts of Oregon, upon the relinquish-ment of federal jurisdiction in this field, had jurisdiction under then existing state law to try Indians for such offenses is a state question." 293 F.2d at 467. The Court then found that the Oregon State Supreme Court had decided that no implementing state legislation was needed, and held that the State Court's conclusion was binding on the federal courts.

The Nebraska Supreme Court has never specifically decided whether a formal acceptance of the jurisdiction granted by 67 Stat. 588 is necessary. However, it can be implied from that Court's decision in State v. Goham, 187 Neb. 35, 187 N.W.2d 305 [1971] that it was of the view that no formal acceptance was necessary.

4. See 25 U.S.C. § 1323 [a], which provides: "The United States is authorized to accept a retrocession by any State of all or any measure of the criminal or civil jurisdiction, or both, acquired by such State pursuant to the provisions of Section 1162 of Title 18, section 1360 of Title 28. * * * " Pub.L. 90–284, Title IV, § 403, Apr. 11, 1968, 82 Stat. 79.

5. Executive Order No. 11435 of Nov. 21, 1968, 33 F.R. 17339 provides:

"Designating Secretary of Interior To Accept Retrocession of Jurisdiction By State.

By virtue of the authority vested in me by section 465 of the Revised Statutes [25 U.S.C. 9] and as President of the United States, the Secretary of the Interior is hereby designated and empowered to exercise, without the approval, ratification, or other action of the President or any other officer of the United States, any and all authority conferred upon the United States by section 403 [a] of the Act of April 11, 1968, 82 Stat. 79 [25 U.S.C. § 1323 [a]: *Provided*, That acceptance of retrocession of all or any measure of civil or criminal jurisdiction, or both, by the Secretary hereunder shall be

In 1969 the Nebraska Unicameral by resolution [6] purportedly offered to retrocede to the United States all of the criminal jurisdiction over offenses committed by Indians in Indian country located in Thurston County, Nebraska, excepting motor vehicle offenses. The Indian country of Thurston County consisted of the Omaha and the Winnebago Indian Reservations.[7]

Since the retrocession offered by Nebraska concerned criminal jurisdiction the Secretary was required under the President's Executive Order [8] to consult with the Attorney General. The Secretary did so, and a letter from the Office

effected by publication in the FEDERAL REGISTER of a notice which shall specify the jurisdiction retroceded and the effective date of the retrocession: *Provided further*, That acceptance of such retrocession of criminal jurisdiction shall be effected only after consultation by the Secretary with the Attorney General.

6. This was done by the adoption of Legislative Resolution 37 which provides as follows:

" LEGISLATION OF NEBRASKA EIGHTIETH SESSION
LEGISLATIVE RESOLUTION 37
Introduced by Legislative Council, C. W. Holmquist, 16th District, Chairman, W. H. Hasebrook, 18th District
. . . . . . . . . . . . . . . .
WHEREAS, the State of Nebraska was given civil and criminal jurisdiction over Indians and Indian territory in this state by the Act of Congress of August 15, 1953, generally known as Public Law 280: and

WHEREAS, the assumption of such jurisdiction has led to steadily increasing costs for law enforcement in certain counties of Nebraska and particularly in Thurston County; and

WHEREAS, because of restrictions in original grants of land in Thurston County to Indians and Indian tribes, Thurston County has not had a sufficient tax base to meet the increasing costs of law enforcement; and

WHEREAS, since 1957, state assistance has been provided for law enforcement purposes in Thurston County, and the cost of this assistance has increased each biennium; and

WHEREAS, Public Law 90–284, adopted as an Act of Congress on April 11, 1968, contains a number of provisions dealing with civil rights and jurisdiction of Indians; and

WHEREAS, Section 403 [a] of Public Law 90–284 provides that the United States is authorized to accept a retrocession of all or any measure of the jurisdiction acquired by a state pursuant to Public Law 280 of 1953; and

WHEREAS, a committee of members of the Legislature appointed by the Executive Board of the Legislative Council following adoption of Public Law 90–284 has studied the problems of law enforcement in Indian areas of this state and the question of a retrocession of jurisdiction, and has met with leaders of the Omaha and Winnebago tribes, county officials and officials of the Bureau of Indian Affairs.

NOW, THEREFORE, BE IT RESOLVED BY THE MEMBERS OF THE NEBRASKA LEGISLATURE IN EIGHTIETH SESSION ASSEMBLED:

1. That the State of Nebraska hereby retrocedes to the United States all jurisdiction over offenses committed by or against Indians in the areas of Indian country located in Thurston County, Nebraska, acquired by the State of Nebraska pursuant to Public Law 280 of 1953, except as provided in paragraph 2 of this resolution.

2. That the retrocession of jurisdiction contained in paragraph 1 of this resolution shall not apply to any offenses involving the operation of motor vehicles on public roads or highways.

3. That the Executive Board of the Legislative Council is hereby authorized and directed to take all necessary action to put this resolution into effect, such action to include arrangements with the Department of the Interior and the department's Bureau of Indian Affairs concerning the assumption of law enforcement responsibilities in the areas of Indian country covered by this resolution.

7. The Omaha Indian Tribe was ceded the land which now constitutes both the Omaha and Winnebago Indian Reservations by a treaty with the United States in 1854. 10 Stat. 1043. In 1865 the United States by treaty with the Omaha Indian Tribe purchased that portion of reservation land from said Indian Tribe which now forms the Winnebago Indian Reservation, 14 Stat. 667, and that land was ceded to the Winnebago Indian Tribe in 1865 by a treaty. 14 Stat. 671.

8. *See* Note 5 *supra*.

of the Solicitor of the Department of the Interior, addressed to an Assistant Attorney General in the Criminal Division of the Department of Justice, dated February 6, 1970 shows that the Secretary had contacted both the Winnebago and Omaha Tribes in Thurston County, Nebraska, in regard to the retrocession. The letter states that although the Omaha Indian Tribe desired to be under federal jurisdiction the Winnebagos equally desired to remain under state jurisdiction. [A copy of the letter is appended hereto]

A letter dated December 11, 1969, from the Executive Board of Nebraska's Legislative Council indicates that that Board approved the transfer back to the federal government of the criminal jurisdiction over the Omaha Tribe alone. [A copy of the letter is appended hereto].

Consistent with the desires of the two Indian tribes, and the approval of the aforesaid State Legislative Board, the Secretary of Interior accepted a retrocession of criminal jurisdiction as to the Omaha Indian Reservation in Thurston County, Nebraska, but not as to the Winnebago Indian Reservation in that Country.

Shortly after the purported retrocession had occurred the United States Bureau of Indian Affairs set up a Tribal Court and a temporary Tribal jail. A judge for the Tribal Court was appointed, and nine Indian policemen were employed. A substantial federal grant financed these implementations.

Despite the purported retrocession and the aforesaid change of circumstances, the non-Indian law enforcement agencies in Thurston County continued to arrest Omaha Indians on criminal charges, and non-Indian County and Municipal judges of the County continued to try members of the Omaha Tribe for offenses allegedly committed within the confines of the Omaha Indian Reservation. And, on February 1, 1971, the Nebraska Legislature purported to withdraw and rescind its previous offer of retrocession by a legislative resolution.[9]

## THE VALIDITY OF THE NEBRASKA RESOLUTION OFFERING A RETROCESSION.

The Legislative Resolution which was passed by the Nebraska Unicameral in 1969 [10] purporting to offer the aforementioned retrocession of criminal jurisdiction over all Indian country in Thurston County, Nebraska, was not presented to the Governor of the State, contrary to a State Constitutional requirement.

Article IV, § 15 of the Nebraska Constitution now provides in pertinent part, as follows:

"Every bill passed by the legislature, before it becomes a law, and every

9. The purported withdrawal of retrocession was accomplished by the following Legislative Resolution:

LEGISLATURE OF NEBRASKA
EIGHTY-SECOND LEGISLATURE
FIRST SESSION
. . . . . . . . . . . . . . . . .
LEGISLATIVE RESOLUTION 16
Introduced by C. W. Holmquist, 16th District _____

WHEREAS, the Eightieth Session of the Nebraska State Legislature, 1969, adopted Legislative Resolution 37, relating to the retrocession to the United States of jurisdiction over offenses committed by or against Indians in the areas of Indian country located in Thurston County, Nebraska, acquired by the State of Nebraska pursuant to Public Law 180 of 1953; and

WHEREAS, the United States has not accepted retrocession in accordance with the terms and provisions of said Legislative Resolution 37.

NOW, THEREFORE, BE IT RESOLVED BY THE MEMBERS OF THE EIGHTY-SECOND LEGISLATURE OF NEBRASKA, FIRST SESSION:

1. That the action of the Eightieth Session of the Nebraska State Legislature, 1969, approving Legislative Resolution 37 is rescinded, and the offer of retrocession therein contained is withdrawn.

2. That a duly attested copy of this resolution be transmitted by the Clerk of the Legislature to the Secretary of Interior of the United States.

[Here appears signature of "Frank Marsh"].

10. See note 6 supra.

order, resolution or vote to which the concurrence of both Houses may be necessary [except on questions of adjournment] shall be presented to the Governor. * * * "

In 1934 Article III, § 1 of the Nebraska Constitution was amended to provide for only a one house legislature, and to abolish the two house system. That section also provides:

"All provisions in the constitution and laws of the state relating to the legislature, the Senate, the House of Representatives, joint sessions of the Senate and House of Representatives, Senator, or Member of the House of Representatives, shall in so far as said provisions are applicable, apply to and mean said Legislature of one chamber hereby created and the members thereof."

In this Judge's opinion the aforesaid Constitutional Amendment, in effect also amended Article IV, § 15 of the Constitution so as to require *all* orders, *resolutions* and votes of the Legislature to be presented to the Governor, whether or not such orders, resolutions or votes were of a type which theretofore had required the concurrence of both houses. Thus the 1969 retrocession resolution should have been presented to the Governor.

My view of how Article IV, § 15 of the Constitution was to be interpreted after 1934, is supported by Nebraska Legislative Bill 301, as found in the 1971 Nebraska Session Laws. That Bill is entitled in pertinent part as follows:

" A BILL

For an Act for submission to the electors of an amendment to Article IV sections 7 and 15, of the Constitution of Nebraska, relating to the executive: * * * to remove obsolete matter; * * *."

The proposed amendment would delete from Article IV, § 15 the reference to a concurrence of both Houses, so that that section if amended would then read as follows:

"Every bill passed by the Legislature, before it becomes a law, and every order, resolution or vote [except on questions of adjournment] shall be presented to the Governor."

Thus, when the preamble to the Bill is read together with the proposed amendment it is apparent that the drafters of the Bill considered the reference to a concurrence of both houses as "obsolete matter." The only thing which could have made the language obsolete, was the aforementioned 1934 Constitutional Amendment.

Since the reference to two houses in Article IV, § 15, has been obsolete since 1934 that provision should have been thereafter read by the Courts as the Constitutional Amendment proposed by Legislative Bill 301 would now make it read in actuality. In other words the amendment proposed by the aforesaid Bill is not an amendment of substance, but merely an amendment to conform the language of the provision to the manner in which it must already be read as a matter of Constitutional interpretation.

■ Based upon the foregoing interpretation it is my conclusion that the Nebraska Constitution required that the 1969 retrocession resolution passed by the Unicameral be presented to the Governor of the State.

■ The question now presented is: What, if any, effect the failure of the Legislature to present the resolution to the Governor has upon the legal validity of the retrocession of jurisdiction being considered herein? For the reasons hereafter stated, it is my opinion that the failure of Nebraska's Legislature to present the resolution to the Governor had absolutely no effect whatsoever upon the legal validity of the retrocession.

I find it significant that the same resolution herein under consideration was before the Nebraska Supreme Court in the case of State v. Goham, 187 Neb. 35, 187 N.W.2d 305 [1971], and that Court did not inquire into its procedural or Constitutional validity.

Since the Nebraska Supreme Court in *Goham* deemed the validity of the retrocession an important issue in whether

or not it had subject matter jurisdiction of the case before it, that Court was under a duty to inquire into all aspects of the question which it deemed important, as is any Court which has its subject matter jurisdiction questioned in a particular case. Also, that Court surely must be charged with knowledge and notice of its own state Constitution, and the provisions therein.

The State of Nebraska, was a party in *Goham*, and is a party in this case. However, I do not deem it necessary to inquire into the technical subtleties of res judicata or collateral estoppel, as it would be extremely difficult to say that under those doctrines the failure of the State to raise the procedural correctness of the resolution in *Goham* would be a bar to this Court's inquiry into the matter.

In any event, this Court does give a good deal of weight in deciding this matter to the fact that the validity of Nebraska Resolution No. 37 was not raised by either the parties or the Court in *Goham*.

In the Nebraska case of Miller v. Hurford, 13 Neb. 13, 17, 12 N.W. 832, 834 [1882], a contention was made that a certain act was " * * * invalid because it was never presented to the governor." The Court in meeting this contention said, as follows:

"The presumptions of the law are that a public officer performs his duty in the manner required by law, and when the speaker of the house of representatives and president of the senate certify that they presented a bill to the governor for his approval, it will be presumed that they presented such bill to the officer whose approval was necessary in order that the bill might become a law." 13 Neb. at 17, 12 N.W. at 834.

Although it is not entirely clear from a reading of the case whether the

Court was referring to a conclusive presumption or merely a rebuttable presumption, it is more readily inferable that a conclusive presumption was intended.[11] *See also* Miller v. Hurford, 11 Neb. 377, 9 N.W. 477 [1881].

In the case of State ex rel. Casper v. Moore, 37 Neb. 13, 55 N.W. 299 [1893], the journals of the Legislature showed an item in an appropriation bill to be $15,000 while the enrolled bill [the one presented the Governor] showed the amount to be $25,000. In other words, the bill presented to the Governor was not the bill actually enacted by the Legislature, and the bill actually enacted was in fact never presented to the Governor. Nonetheless the Nebraska Supreme Court upheld the bill which had actually been passed by the Legislature, even though never presented to the Governor. The Court indulged in the presumption that since the Governor actually approved the greater sum, approval of the lesser sum could be implied. One commentator has said: "It seems difficult to support the reasoning of this case." Nutting, The Enrolled Bill and the Validity of Legislation, 15 Neb.L.Bulletin 233, 236 [1937]. This Court would have to agree, but in any event the case manifests a definite reluctance on the part of the Nebraska Supreme Court to invalidate otherwise valid legislation, under the Constitutional provision calling for presentation of all bills to the governor. The aforementioned law review article also suggests that non-compliance with state constitutional provisions prescribing certain procedures in regard to legislation, such as presentation to the governor, constitutes a political question which the Courts need not get into, but for which the elected representatives must answer to the electors.

Even assuming that the Nebraska Supreme Court would hold that the resolution, under consideration herein, is in-

11. The Legislative Resolution being considered herein, *see* note 6 *supra*, unlike the act involved in *Miller*, does not contain a certification by the President of the Legislature that it was presented to the Governor. Thus, a strong argument could be made that the presumption referred to in *Miller* was never even raised in the present case.

valid this writer is of the opinion such a holding could not upset an otherwise valid retrocession under 25 U.S.C. § 1323 [a].[12]

In Leser v. Garnett, 258 U.S. 130, 137, 42 S.Ct. 217, 218, 66 L.Ed. 505 [1922], a contention was made that the Nineteenth Amendment to the Federal Constitution was invalid because the ratifying resolutions of Tennessee and West Virginia were inoperative, " * * * because adopted in violation of legislative procedure prevailing in the respective states." In meeting this argument the United States Supreme Court through the eminent Justice Brandeis said:

> "As the legislatures of Tennessee and of West Virginia had power to adopt the resolutions of ratification, official notice to the Secretary, duly authenticated, that they had done so, was conclusive upon him, and being certified to by his proclamation, is conclusive upon the courts." [citations omitted] 258 U.S. at 137, 42 S.Ct. at 218.

It is true that unlike the *Leser* case we are not dealing with state ratification of an amendment to the Federal Constitution. But we are dealing with a federal statute [13] passed pursuant to the Federal Constitution, and the process involved herein, like that involved in *Leser* is a federal process which " * * * transcends any limitations sought to be imposed by the people of a state." 258 U.S. at 137, 42 S.Ct. at 218. If it were otherwise the executive branch of the United States Government would be subordinated to the provisions of the state constitutions. This cannot be. As said by the great Chief Justice Marshall in McCulloch v. Maryland, 17 U.S. [4 Wheat.] 316, 406, 4 L.Ed. 579 [1819]:

> "The government of the United States, then, though limited in its powers, is supreme; and its laws, when made in pursuance of the constitution, form the supreme law of the land, 'anything in the constitution or laws of any

state to the contrary notwithstanding.' "

Thus, the question is not whether the state resolution was valid under state law, but whether it was valid under federal law. In other words, was the resolution a sufficient manifestation of assent by the State to enable the United States Secretary of Interior to accept a retrocession pursuant to the power bestowed upon him by the President [14] and the Congress? [15] I am of the opinion that it was.

My view is supported by the case of United States ex rel. Widenmann v. Colby, 49 U.S.App.D.C. 358, 265 F. 998 [1920]. That case involved the ratification of the Eighteenth Amendment to the Federal Constitution. The petitioner in that case contended that the notices of the several states ratifying the Amendment were not properly issued. Section 205 of the Revised Statutes of the United States provided:

> "Whenever official notice is received at the Department of State that any amendment proposed to the Constitution of the United States has been adopted, according to the provisions of the Constitution, the Secretary of State shall forthwith cause the amendment to be published in the newspapers authorized to promulgate the laws, with his certificate, specifying the States by which the same may have been adopted, and that the same has become valid, to all intents and purposes, as a part of the Constitution of the United States."

In discussing the power vested in the Secretary of State as a result of the aforesaid statute the United States Court of Appeals for the District of Columbia Circuit stated as follows:

> "It will be observed that by this section is [sic] was the duty of the Acting Secretary of State, upon receiving official notice from three-fourths of the several States [Constitution, art. 5] that the proposed

---

12. *See* note 4 *supra.*

13. *Supra.*

14. *See* note 5 *supra.*

15. *See* note 4 *supra.*

amendment had been adopted, to issue his proclamation. He was not required, or authorized, to investigate and determine whether or not the notices stated the truth. To accept them as doing so, if in due form, was his duty. As soon as he had received the notices from 36 of the states that the amendment had been adopted, he was obliged, under the statute, to put forth his proclamation. No discretion was lodged in him. The act required was purely ministerial. Now, there is no allegation in the petition of Widenmann that the Acting Secretary of State did not receive official notice from the requisite number of states, nor does the petitioner in argument claim that he did not. In fact, as we understand it, he admits that he did. His insistence is that the officials of the several states should not have issued the notices; but, as we have said, the Acting Secretary had no authority to examine into that matter, to look behind the notices. From these considerations it follows that the Acting Secretary, instead of failing to perform a duty imposed upon him by statute, the performance of which should be coerced by Mandamus, performed a duty enjoined upon him by statute in issuing the proclamation in question. Under those circumstances there is no basis for the relief sought by the petitioner." [citations omitted] 265 F. at 999–1000.

Almost identical language could be used in describing the discretion and authority of the Secretary of Interior under 25 U.S.C. § 1323 [a] [16] and the Executive Order pursuant thereto.[17] Section 1323 [a] did not prescribe the type of retrocession notice which the United States must receive from the officials of a state before an acceptance by the United States could occur. The Secretary was not authorized to investigate the procedural or technical validity of every notice he received. In this writer's opinion once the Secretary received from the state officials what appeared to be

an official act of the state offering a retrocession, he was entitled to rely thereon for purposes of the acceptance authorized by the federal statute.

If the elected representatives of the State of Nebraska acted beyond their power in sending the Secretary of Interior a notice offering a retrocession of jurisdiction over certain Indian country, then they must answer to the people of the state for their negligence. This, however, is clearly a political question. See Coleman v. Miller, 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 [1939]. The great Justice Frankfurter in his concurrence in *Coleman* said:

"The procedures for voting in legislative assemblies—who are members, how and when they should vote, what is the requisite number of votes for different phases of legislative activity, what votes were cast and how they were counted—surely are matters that not merely concern political action but are of the very essence of political action, if 'political' as any connotation at all. * * * In no sense are they matters of 'private damage'. They pertain to legislators not as individuals but as political representatives executing the legislative process. To open the law courts to such controversies is to have courts sit in judgment on the manifold disputes engendered by procedures for voting in legislative assemblies. * * * " 307 U.S. at 469–470, 59 S.Ct. at 989 [concurring opinion].

The procedural validity of the resolution herein is as much a political question as the procedural validity of the resolution presented in *Coleman*, and this Court will not decide a political question, but will defer to the decision by the Secretary of Interior that the notice he received from Nebraska was sufficient. See also, United States v. Gugel, 119 F.Supp. 897 [D.Ky.1954]; United States v. Hunting Rights of Swan Lake Hunting Club, 237 F.Supp. 290 [N.D.Miss. 1964].

16. *Supra.*

17. *See* note 5 *supra.*

DID THE UNITED STATES SECRE-TARY OF INTERIOR ACT WITHIN THE POWER CONFERRED UPON HIM BY CONGRESS AND THE PRES-IDENT, WHEN HE ACCEPTED A RETROCESSION OF CRIMINAL JUR-ISDICTION ONLY AS TO THE OMA-HA INDIAN TRIBE?

The defendants have argued that the purported acceptance of retrocession by the Secretary of Interior was an abuse of the authority granted him by Executive Order No. 11435 [18] and was in effect a void act. Accordingly, they contend that the State still has exclusive jurisdiction of the Omahas by virtue of the 1953 transfer of jurisdiction by the federal government.[19]

The Supreme Court for the State of Nebraska considered this very issue in a criminal case entitled State v. Goham, 187 Neb. 35, 187 N.W.2d 305 [1971]. There the defendant raised as a defense against a charge of kidnapping and rape the argument that the State of Nebraska had lost jurisdiction over the defendant by reason of retrocession. The Supreme Court held that the retrocession never became effective because the acceptance of the Secretary of Interior was only a partial acceptance and unless or until it was approved by the State of Nebraska was of no force and effect. With this conclusion I cannot agree.

The Act providing for retrocession, 25 U.S.C.A. § 1323, authorized the United States to accept retrocession " * * * by any state of all or *any measure* of the criminal or civil jurisdiction * * * acquired by such State pursuant to the provisions of section 1162 of Title 18. * * * " As I see it, in the statute in which it was set forth "all or any measure" could be subject to two interpretations:

1. That "all or any measure" means that the government has the right to accept all or part of the jurisdiction offered by the State, and that a partial acceptance would be a valid acceptance;

2. That an acceptance of "all or any measure" refers only to the actual offer of retrocession made by the State and acceptance of less than that which was offered would be an invalid acceptance.

The Supreme Court of Nebraska compared the offer and acceptance to a contract and reasoned that since the acceptance did not include all the jurisdiction offered it was " * * * completely unauthorized by the terms of the Resolution of the Nebraska Legislature, and so does not constitute an acceptance."

The problem I have in accepting this interpretation reached by the High Court of Nebraska is that here we are not considering a contract that was entered into between Nebraska and the United States Government, but rather a Legislative Act. The issue, as I see it, is simply whether the Secretary of the Interior was authorized in accordance with 25 U.S.C. § 1323 and Executive Order No. 11435 to accept a retrocession of less than that offered by the State of Nebraska. I believe he was.

Section 1323 of Title 25 provides: "[T]he United States is authorized to accept a retrocession by any State. * * * " The word "retrocession" refers to a complete act. When the Secretary of the Interior accepted the offer of retrocession by a state the retrocession referred to in the above-cited Statute occurred. The final act necessary to effectuate retrocession was expressly reserved to the United States Government. To accept defendant's contention that the partial acceptance by the Secretary of Interior was a counter-offer that had to be accepted by the State of Nebraska would leave to the State the final act necessary for the occurrence of a complete retrocession. I believe that the words "[T]he United States is authorized to accept a retrocession by any State of all or any measure of criminal * * * jurisdiction * * * acquired by such State pursuant to the provisions of section 1162 of Title 18

---

18. *Supra.*

19. *See note 1 supra.*

\* \* \*'' refutes the above contention and gives the United States Government the right to accept "any measure" of the jurisdiction offered back to it by a State. When reading a statute effect must be given, if possible, to the whole statute and every part thereof. *See* D. Ginsburg & Sons v. Popkin, 285 U.S. 204, 52 S.Ct. 322, 76 L.Ed. 704 [1931].

The defendants argue that the Secretary of Interior's acceptance was ineffective because it exceeded his granted authority. With the general proposition that "administrative determinations must have a basis in law and must be within the granted authority" I have no quarrel. *See* Social Security Board v. Nierotko, 327 U.S. 358, 66 S.Ct. 637, 90 L.Ed 718 [1946]. However, here I feel 25 U.S.C. § 1323 and Executive Order 11435 give the Secretary of Interior the authority to accept part of the offer of retrocession.

Further support for the conclusion I have reached is found in the statute by its providing for piecemeal retrocession. The statute expressly allowed for retrocession of all or any measure of criminal or civil jurisdiction, or both. Such flexibility reflects an intention to allow the Secretary the power to divide the jurisdiction.

Further 25 U.S.C. § 1323 [a] should be read in light of the legislative and judicial policy of construing statutes in favor of Federal jurisdiction, *see* Rice v. Olson, 324 U.S. 786, 65 S.Ct 989, 89 L.Ed. 1367 [1945], and, according to the familiar rule that "legislation affecting the Indians is to be construed in their interest. \* \* \*'' United States v. Nice, 241 U.S. 591, 599, 36 S.Ct. 696, 698, 60 L.Ed. 1192 [1916].

A great deal of weight must be given to the conclusion of the Secretary of Interior as to the extent of his power and authority under 25 U.S.C. § 1323 [20] and Executive Order 11435.[21] Dixon v. Cox, 268 F. 285 [8th Cir. 1920].

In addition, it may well be that under a principle of law announced by the United States Supreme Court, the Secretary of Interior had no choice but to defer to the desires of the individual Indian tribes as to whether they wanted to be under federal jurisdiction. In the case of Inre Heff, 197 U.S. 488, 25 S.Ct. 506, 49 L.Ed. 848 [1905] Mr. Justice Brewer in speaking for the Court stated:

"We are of the opinion that, when the United States grants the privileges of citizenship to an Indian, gives to him the benefit of, and requires him to be subject to, the laws, both civil and criminal, of the state, it places him outside the reach of police regulations on the part of Congress; that the emancipation from Federal control, thus created, cannot be set aside at the instance of the government without the consent of the individual Indian and the state, \* \* \*'' 197 U.S. at 509, 25 S.Ct. at 512.

*Heff* was overruled by United States v. Nice, 241 U.S. 591, 36 S.Ct. 696, 60 L.Ed. 1192 [1916] but on another point of law.

Although the United States Supreme Court held in Elk v. Wilkens, 112 U.S. 94, 5 S.Ct. 41, 28 L.Ed. 643 [1884], that Indians did not acquire citizenship by virtue of the Fourteenth Amendment to the United States Constitution, that injustice was cured by the Citizenship Act of June 2, 1924, 8 U.S.C. § 1401, making citizens of all Indians. *See also*, Deere v. New York, 22 F.2d 851 [N.D. N.Y.1927]. Thus, when jurisdiction over the Indians in Indian country within the State of Nebraska was given to the State in 1953 by the federal government,[22] the Indians became fully emancipated according to the above language of the Heff case, and if that language still has merit the federal government could not reacquire jurisdiction without the consent of both the State and the Indians.

20. *See* note 4 *supra.*

21. *See* note 5 *supra.*

22. *See* note 1 *supra.*

Although the language of *Heff* refers to the consent of "the individual Indian" this Court is of the opinion that such consent can be manifested by the democratic process of assent through the tribal council, and thus whatever that body consents to binds all members of the tribe.

Therefore, when the State offered to retrocede criminal jurisdiction as to both the Winnebago and Omaha Indian Tribes, only part of the process was initiated, since according to *Heff*, the Secretary of Interior in acting for the United States was also under an obligation to determine the desires of the Indians as well. In doing so he found that the Winnebagos did not consent to the resumption of federal jurisdiction, and he was therefore powerless, under *Heff*, to acquire jurisdiction over them.

On the other hand, the Omahas did consent to resumption of federal jurisdiction, and the Secretary could pursuant to *Heff* acquire jurisdiction over them.

In short, under *Heff*, the Secretary of Interior in exercising the authority vested in him by Congress and the President, could not have done otherwise than what he did. He could accept jurisdiction only as to those Indians who consented [*i. e.*, the Omahas].

It is therefore this Court's conclusion that the action of the United States Secretary of Interior in accepting a retrocession by the State of Nebraska of the criminal jurisdiction of only the Omaha Indian Tribe in Thurston County, Nebraska was within the power and authority bestowed upon him by the Congress and the President, even though the State offered a retrocession as to both the Omahas and Winnebagos in said county. And no state constitutional provision, statute, or judicial decision can reduce the power which the Secretary of Interior of the United States has acquired by an Act of Congress, because when such an Act, passed pursuant to the Federal Constitution, conflicts with a state constitutional provision, statute or judicial decision the Act of Congress according to Article VI, clause 2 of the United States Constitution controls. *See also* McCulloch v. Maryland, 17 U.S. [4 Wheat.] 316, 406, 4 L.Ed. 579 [1819].

It is an argument such as that advanced by defendants herein which prompted Chief Justice Marshall in Gibbons v. Ogden, 22 U.S. [9 Wheat.] 1, 6 L.Ed. 23 [1824], to remark:

"Powerful and ingenious minds, taking as postulates, that the powers expressly granted to the government of the Union, are to be contracted, by construction, into the narrowest possible compass, and that the original powers of the states are retained, if any possible construction will retain them, may, by a course of well-digested, but defined and metaphysical reasoning, founded on these premises, explain away the constitution of our country, and leave it, a magnificent structure, indeed, to look at, but totally unfit for use. They may so entangle and perplex the understanding, as to obscure principles, which were before thought quite plain, and induce doubts, where, if the mind were to pursue its own course, none would be perceived. In such a case, it is peculiarly necessary to recur to safe and fundamental principles, to sustain those principles, and, when sustained, to make them the tests of the arguments to be examined." 22 U.S. [4 Wheat.] at 220.

## DID THE STATE OF NEBRASKA ACQUIRE CRIMINAL AND CIVIL JURISDICTION OVER THE OMAHA TRIBE OF INDIANS BY VIRTUE OF THE LAND ALLOTMENT ACT OF 1882?

The defendants further contend that the State of Nebraska had already acquired criminal and civil jurisdiction over the Omaha Tribe of Indians as a result of an Act of Congress on August 7, 1882, 22 Stat. 341.[23] Under the en-

---

23. Sections 6 and 8 of the 1882 Act provide:

"Sec. 6. That upon the approval of the allotments provided for in the preceding

actment the United States was to allot to certain described members of the tribe a portion of land within the reservation, and was to later issue patents to said Indians for said land. Upon completion of both the allotments and issuance of patents each member of the tribe was to " * * * have the benefit of and be subject to the laws, both civil and criminal, of the State of Nebraska. * * * "

■ Accordingly, the purpose of the above-mentioned statute was to distribute all of the land of the Omaha Reservation to members of the Omaha Tribe and upon completion of all grants of real estate to render all members of the Tribe-subject to the state civil and criminal laws. Allotments under Section 6 were completed in July of 1884. Allotments under Section 8 of the Act were to continue during the twenty-five year trust period, in order that after-born

children could be allotted the residue of lands remaining after the Section 6 allotments. Section 7 expressly applied to Section 6 and Section 8 allotments. In effect the statute provided that trust patents would be issued immediately and fee patents twenty-five years after the completion of the allotment.

Accordingly, State law was to apply within the Omaha Reservation when two things occurred:

■ The completion of the allotments; and [2] the patenting of the land to the allottees.

It is apparent from the Act of 1882 that it was the intention of Congress that when all Indian land was in individual ownership, State law should commence to apply and that Federal jurisdiction would then be withdrawn. *See* United States v. Ramsey, 271 U.S. 467, 46 S.Ct. 559, 70 L.Ed. 1039 [1926].

section by the Secretary of the Interior, he shall cause patents to issue therefor in the name of the allottees, which patents shall be of the legal effect and declare that the United States does and will hold the land thus allotted for the period of twenty-five years in trust for the sole use and benefit of the Indians to whom such allotments shall have been made, or in case of his decease, of his heirs according to the laws of the State of Nebraska, and that at the expiration of said period the United States will convey the same by patent to said Indian or his heirs as aforesaid, in fee discharged of said trust and free of all charge or incumbrance whatsoever. And if any conveyance shall be made of the lands set apart and allotted as herein provided, or any contract made touching the same before the expiration of the time above mentioned, such conveyance or contract shall be absolutely null and void: *Provided*, that, the law of descent and partition in force in the said State shall apply thereto after patents therefor have been executed and delivered.

"Sec. 8. That the residue of lands lying east of the said right of way of the Sioux City and Nebraska Railroad, after all allotments have been made, as in the fifth section of this act provided, shall be patented to the said Omaha tribe of Indians, which patent shall be of the legal effect and declare that the United States does and will hold the land thus patented,

for the period of twenty-five years in trust for the sole use and benefit of the said Omaha tribe of Indians, and that at the expiration of said period the United States will convey the same by patent to said Omaha Tribe of Indians, in fee discharged of said trust and free of all charge or incumbrance whatsoever: *Provided*, That from the residue of lands thus patented to the tribe in common, allotments shall be made and patented to each Omaha child who may be born prior to the expiration of the time during which it is provided that said lands shall be held in trust by the United States, in quantity and upon the same conditions, restrictions, and limitations as are provided in section six of this act, touching patents to allottees therein mentioned. But such conditions, restrictions, and limitations shall not extend beyond the expiration of the time expressed in the patent herein authorized to be issued to the tribe in common."

Section 7 of said statute provided:

"Sec. 7. That upon the completion of said allotments and the patenting of the lands to said allottees, each and every member of said tribe of Indians shall have the benefit of and be subject to the laws, both civil and criminal, of the State of Nebraska; and said State shall not pass or enforce any law denying any Indian of said tribe the equal protection of the law."

However, as allotments were carried out the Indian tribal organizations did not disappear and the Indian allegiances to tribal customs were not abandoned. This may explain in part why several of the allotments were never completed, and why many of the recipients of allotments were never issued fee patents. But why did the government continue to hold the land in trust for the Indians? See Affidavit of Alfred DuBray, Superintendent of the Winnebago Agency of the Bureau of Indian Affairs, Department of Interior of the United States Government [Filing #17].

Thus as the requirements of Section 7 of the 1882 Act have not been met the criminal jurisdiction within the Omaha Reservation was not passed to the State of Nebraska by virtue of this statute. There have been further Federal Acts regarding the allotment of land on the Omaha Reservation, but none of these statutes affects the jurisdictional question here under discussion, and the recital of same would add nothing but length to this opinion.

Defendants have cited no other statutory authority for asserting criminal jurisdiction over the Omaha Reservation but do make reference to the case of Hallowell v. United States, 221 U.S. 317, 31 S.Ct. 587, 55 L.Ed. 750 [1911]. There the Supreme Court of the United States considered a question certified to it by the Eighth Circuit Court of Appeals. The question was simply whether under the Federal statutes herein cited could the United States Government prohibit the bringing of intoxicating liquors on the Omaha Tribe Reservation. Justice Day, after setting forth Sections 6 and 7 of the 1882 Act also set forth Section 6 of the Act of February 8, 1887, 24 Stat. 388. This section provided:

"Sec. 6. That upon the completion of said allotments and the patenting of the lands to said allottees, each and every member of the respective bands or tribes of Indians to whom allotments have been made shall have the benefit of and be subject to the laws, both civil and criminal, of the State or Territory in which they may reside; and no Territory shall pass or enforce any law denying any such Indian within its jurisdiction the equal protection of the law. And every Indian born within the territorial limits of the United States to whom allotments shall have been made under the provisions of this act, or under any law or treaty, and every Indian born within the territorial limits of the United States who has voluntarily taken up, within said limits, his residence separate and apart from any tribe of Indians therein, and has adopted the habits of civilized life, is hereby declared to be a citizen of the United States, and is entitled to all the rights, privileges, and immunities of such citizens, whether said Indian has been or not, by birth or otherwise, a member of any tribe of Indians within the territorial limits of the United States, without in any manner impairing or otherwise affecting the right of any such Indian to tribal or other property."

Justice Day then made the general comment that:

"It is apparent that, at the time of the commission of the alleged offense, the place wherein it was alleged to have been committed was a part of lands allotted to an Indian; that the title to the lands allotted was still held in trust by the United States for the benefit of the Indian to whom the allotment had been made; that the plaintiff in error had been declared to be a citizen of the United States, and entitled to the rights, privileges, and immunities of such citizenship, and entitled to the benefit of the laws, civil and criminal, of the state of Nebraska, in which the Indian allotment was situated, and upon which the offense is alleged to have been committed."

The Court later in the opinion added:

"While for many purposes the jurisdiction of the state of Nebraska had attached, and the Indian as a citizen was entitled to the rights, privileges, and immunities of citizenship.  *  * ”

The High Court then went on to answer the question certified to it by the lower court. It is obvious this case lends no weight to defendants' position. There is general language in the case that, "[W]hile for many purposes the jurisdiction of the state of Nebraska" had some type of operation within the Omaha Reservation, the case did not define what this jurisdiction might have been. Further, in *Hallowell*, the court considered the Act of 1887 as well as the 1882 Act. The 1887 Act provided that state criminal and civil law should apply to individual Indians when and if they received allotments and patents and departed from their allegiance to an Indian tribe. The defendant in *Hallowell* was also an allottee under the Act of 1887. *See Hallowell, supra*, at page 320, 31 S.Ct. 587.

In any event the case of United States v. Nice, 241 U.S. 591, 36 S.Ct. 696, 60 L.Ed. 1192 [1916] casts extreme doubt upon any argument that Nebraska acquired exclusive jurisdiction, either civil or criminal, over the Omahas as a result of the Allotment Act.

■ Any contention of defendants that a State has exclusive jurisdiction over crimes committed within its borders is foreclosed by the Supreme Court's decision in Rice v. Olson, 324 U.S. 786, 65 S.Ct. 989, 89 L.Ed. 1367 [1945], and the Nebraska Supreme Court's decision in Ex Parte Cross, 20 Neb. 417, 30 N.W. 428 [1886].

Accordingly, I have concluded that criminal jurisdiction over crimes committed by or against Indians within the confines of the Omaha Reservation rests in the Federal Government.

In Kitto v. State, 98 Neb. 164, 152 N.W. 380 [1915] the Supreme Court for the State of Nebraska observed that Congress had not reserved to the federal courts the jurisdiction to punish for misdemeanors. The Court noted that there was no Federal Act that gave jurisdiction to the federal courts for such crimes and that "[I]f such jurisdiction is not vested in the state courts, it is not vested anywhere and the perpetrators of misdemeanors of all kinds on an Indian reservation may go unpunished." Kitto v. State, 152 N.W. at page 383. I would be inclined to follow this rationale as to misdemeanors but the evidence adduced at the hearing held in this matter established to my satisfaction that Omaha Indian Tribe has a qualified police force and is able to properly prosecute misdemeanors. The Omaha Indian Tribe did offer to deputize Walthill Police Officers as the Tribe police in order to give them jurisdiction over Indian crimes on behalf of the Tribe, but said offer was turned down.

Accordingly, the state of affairs as they exist today removes the present action from the rationale of *Kitto*.

■ Plaintiff has asked for an accounting of all fines, penalties and costs collected on account of prosecutions of Indians of crimes committed within the Omaha Reservation since October 25, 1970. I do not feel said relief is justified under the circumstances heretofore presented. The Thurston County officials were acting within and under the justified belief that they had jurisdiction for misdemeanors. Accordingly, said relief will not be granted.

The offer of retrocession retained jurisdiction for all motor vehicle offenses committed on the state public roads or highways and this jurisdiction will remain exclusively within the State of Nebraska.

The Federal Government has exclusive jurisdiction of all major crimes enumerated in the federal statutes granting said jurisdiction [18 U.S.C. § 1153].

Counsel for the plaintiffs will submit a proposed judgment for my approval within ten [10] days from the date of this Memorandum.

### APPENDIX A
#### December 11, 1969

Mr. Louis R. Bruce
Commissioner of Indian Affairs
1951 Constitution Avenue, N.W.
Washington, D.C.

Dear Mr. Bruce:

A report has been made to the Executive Board of the Nebraska Legislative Coun-

cil by Senator Claire Holmquist and Mr. George Gerdes as a result of their recent trip to Washington. The essence of this report was that the control over criminal justice of the Omaha Tribe should be transferred back to the Bureau of Indian Affairs.

This is to inform you that the Executive Board of the Legislative Council has approved this report and its recommendations.

Sincerely,

(s) Jack W Rodgers

Jack W. Rodgers

Director of Research

JWR/ss

APPENDIX B

UNITED STATES

DEPARTMENT OF THE INTERIOR

OFFICE OF THE SOLICITOR

WASHINGTON, D.C. 20240

Feb. 6, 1970

Honorable Will R. Wilson
Assistant Attorney General
Criminal Division
Department of Justice
Washington, D. C. 20530

Dear Mr. Wilson:

Enclosed is a certified copy of Legislative Resolution 37 of the Eightieth Session of the Legislature of Nebraska, purporting to retrocede to the United States pursuant to Section 403 of the Civil Rights Act of April 11, 1968, 82 Stat. 73, 79, 25 U.S.C. § 3323 (Supp. IV, 1965–1968), all jurisdiction over offenses (except those involving the operation of motor vehicles over public roads or highways) committed by or against Indians in the areas of Indian country located in Thurston County, Nebraska, acquired by the State of Nebraska pursuant to the Act of August 15, 1953, 67 Stat. 588, as amended, 18 U.S.C. § 1162.

Thurston County, Nebraska, contains major portions of two Indian reservations under the jurisdiction of the United States, each constituting a separate area of "Indian country" as defined in 18 U.S.C. § 1151. One such reservation is for the Winnebago Tribe; the other is for the Omaha Tribe. The Omaha Reservation also extends into adjoining counties of Cuming and Burt, and the Winnebago Reservation extends into adjacent Dixon County. Only Thurston County is mentioned in Legislative Resolution 37.

The tribal governing bodies of both tribes have on several occasions considered the desirability of having their reservations continued under state jurisdiction vis-a-vis having them returned to federal jurisdiction. The Omahas have consistently expressed the desire that the United States accept the retrocession tendered by the State of Nebraska; the Winnebagos have with equal consistency expressed the desire to remain under state jurisdiction.

The matter of partial acceptance of Nebraska's tender has been discussed with representatives of both tribes and of the State. We perceive no legal obstacle to such a course. The Executive Board of the Legislative Council of Nebraska has been informed of the situation and has approved acceptance by the United States of jurisdiction over the Omaha Reservation only. Enclosed is a copy of a letter of December 11, 1969, to the Commissioner of Indian Affairs from the Director of Research of the Legislative Council, which evidences such approval.

The law enforcement situation on the Omaha Reservation is a matter of concern to the tribe and to this Department, and representatives of the State of Nebraska have told us that the state is not able to increase its program. If anything, it is expected to decrease at the end of the current fiscal year. The Nebraska State Legislature does not meet until 1971, and it is important that action be taken as soon as possible to improve the law and order program on the Omaha Reservation.

We are, therefore, prepared to accept partially the tender of retrocession made by Nebraska, accepting jurisdiction only with respect to the Omaha Reservation. Enclosed is a copy of a proposed Notice of Acceptance of Retrocession of Juris-

diction which we believe will accomplish the desired end and the intended purpose. Before presenting the notice to the Secretary, however, we take this means of seeking your consultation as provided by Executive Order No. 11435, of November 21, 1968.

We will be glad to provide such additional information as you may feel necessary.

Sincerely yours,

/s/ Raymond C. Coulter
Acting Solicitor

Enclosures

cc: Secretary's Files
Solicitor's Files
BLA (2)
Asst. Sol. ILA
Assoc. Sol. IA

CMSoller:mcs:1–30–70